Argued September 9, decided September 30, 1913.

# SERVICE LUMBER CO. *v.* SUMPTER VALLEY RY. CO.*

## (135 Pac. 539.)

**Carriers—Action for Overcharge—Evidence—Rates on Logs and Lumber.**

1. In an action against a railway for overcharges on shipments of lumber, the fact that defendant's tariff classified logs as subject to the lumber rates was an admission by defendant proper to go to the jury as to the reasonableness of the rates for lumber; and, as a shipper of logs necessarily competes with a shipper of lumber, the rate for logs was also admissible.

**Pleading—Objections—Redundancy.**

2. Where evidence as to the rate on logs was admissible in determining the reasonableness of the rate on lumber, the allegation in a shipper's action to recover overcharges on lumber that shippers of logs were charged a lesser rate was merely a pleading of evidence, and, redundancy not having been urged, the court below was justified in overruling the motion to strike out such allegation as immaterial.

**Carriers—Action for Overcharges or Discrimination—Pleading.**

3. A complaint that plaintiff, who was compelled to ship his lumber over defendant's road, was charged excessive and unreasonable rates and more than those to competing shippers, sought only to recover money had and received in the form of freight overcharges and was not an action for damages for discrimination between shippers, and hence was not objectionable as stating two causes of action or joining them in one count.

**Pleading—Separate Counts.**

4. Where it did not appear upon the face of the complaint that a shipper's action to recover freight overcharges was brought upon various shipments of lumber on different bills of lading, the shipper was not required to state his cause of action in separate counts based upon each shipment and bill of lading therefor, since in such action it is immaterial that the money demanded may possibly have accrued as the sum of various items received at different times.

**Corporations—Dissolution—Existence for Purpose of Bringing Action.**

5. Under the express provision of Section 6699, L. O. L., a corporation exists for five years after its dissolution for the purpose of wind-

---

*As to the recovery back of overcharges made by public service corporation, see note in 18 L. R. A. (N. S.) 124.

Upon the elements entering into determination of reasonableness of railroad rates prescribed by the state for local traffic, see notes in 15 L. R. A. (N. S.) 108, and 25 L. R. A. (N. S.) 1001.    REPORTER.

ing up its affairs, including necessary litigation, the only restriction being that it shall not continue its corporate business.

### Corporations—Actions After Dissolution—Matter in Abatement—Waiver.

6. In an action by a corporation after dissolution to recover overcharges on freight shipments·over defendant road, its neglect to take any preliminary step necessary in the way of employing attorneys or directing someone to institute the action would have been properly urged by a plea in abatement but was waived by answering to the merits.

### Carriers—Action for Overcharges—Limitations.

7. Act of February 20, 1885 (Laws 1885, p. 38), making it unlawful to charge or receive a different rate of freight from one person than from another for like service, and forbidding the charge of greater rates than those in force on January 1st of that year, and requiring it to adopt and post its tariffs on the first Monday of each January and July, construed as a maximum rate law prohibiting rebates, and by Section 7 making a road liable to a person injured in threefold damage recoverable by an action commenced within three years, did not refer to freight overcharges, so that the limitation did not apply to an action to recover such overcharges.

### Carriers—Action for Overcharges—Evidence—Reasonableness.

8. Such statute giving no further effect to the posting of schedules than to require that subsequent charges should not exceed those posted, a road's compliance therewith by posting rates of 10 cents per hundred pounds on lumber between certain points was not evidence that such rate was reasonable.

### Carriers—Action for Overcharges—Payment of Charge by Plaintiff.

9. In an action to recover overcharges on shipments of lumber, where it appeared that a connecting line paid defendant's freight bills, carried them as advanced charges, and collected them with its own at the final destinations in other states, and that the consignee deducted the total freight charges from the invoice price, it was not necessary that plaintiff first take an assignment of a cause of action from his consignee, since in the action for money had and received it is sufficient to show that by any money transaction the defendant has received money or its equivalent which in equity and good conscience belongs to and should be paid to the plaintiff, and this is true although the plaintiff may never have had actual possession of the money.

### Carriers—Action for Overcharges—Voluntary Payment by Plaintiff.

10. Where plaintiff of necessity had to ship his lumber over defendant's road, the fact that he contracted to pay an unreasonable rate and paid it without protest would not bar a recovery, since, where payments are made to a common carrier for freight, the individual shipper does not deal at arm's length with the carrier or occupy a situation similar to that of one voluntarily paying money with knowledge of all the circumstances.

#### Carriers—Action for Freight Overcharges—Evidence.

11. In a shipper's action to recover overcharges on shipments of lumber, evidence as to rates paid by another shipper during the same time was admissible as being in the nature of an admission against the road's interest; the inference being that, as it would not likely charge less than was reasonable in its dealings with such other shipper, the greater rate exacted from the plaintiff was unreasonable.

#### Evidence—Self-serving Declarations—Railroad's Tariff Schedules.

12. In such case the subsequent filing of defendant's tariff rates with the State Railway Commission would be in the nature of a self-serving declaration and inadmissible.

#### Carriers—Action for Overcharges—Instructions.

13. In such case where the question was whether the charges were reasonable, and where both parties conceded that if the shipment was an interstate shipment the plaintiff could not recover because the question of reasonableness was exclusively for the Interstate Commerce Commission, a letter from defendant's attorney to an Interstate Commerce Commissioner, embodying a clear statement of the contention that the shipment in question was an intrastate shipment, was properly adopted by the court in submitting the issue of interstate or intrastate shipments.

#### Carriers—Action for Overcharges—Question for Jury—Interstate or Intrastate Shipment.

14. In such case bills of lading for shipments of lumber, showing upon their face that they were interstate shipments, were not conclusive as to the character of the shipments; but, where there was evidence that notations were inserted in the bills of lading for the convenience of the shipper and that the shipment over defendant's road was preparatory to an intended delivery to a nonresident consignee, the question whether the shipments were interstate or intrastate was for the jury.

#### Commerce—Interstate or Intrastate Commerce.

15. Where a shipper assembles his goods at a shipping point within a state and the transaction is there concluded in good faith, it is immaterial that he may contemplate a subsequent shipment into another state or that the intrastate shipment may be preparatory to interstate transportation; but where the owner of property, for the purpose of delivering it for sale in another state, intrusts it to a connecting line of a road managing a continuous carriage from one state to another, the shipment became interstate commerce on delivery to the first carrier, although its line was wholly within the state where the shipment originated, it being the relation sought to be established between the consignor and consignee that must govern the question.

#### Carriers—Freight Charges—Reasonableness.

16. A railroad is entitled to a fair return upon its capital judiciously and honestly expended and is entitled to meet competition; the question of competition as well as grades, character of shipment, the extent of responsibility, the wear and tear of equipment, and many other factors enter into the computation of what is a reasonable rate, so that defendant railroad had the right to fix a lower rate

67 Or.—5

for a shorter haul outside the zone in which plaintiff's shipment was made, if such lower rate was made to meet a possible competition by a wagon haul.

**Carriers—Freight Charges—Reasonableness.**

17.   It is the relation between the carrier and the general public rather than the individual that is controlling on the question of reasonableness of charges, and what the individual can afford to pay is not the standard by which freight charges are to be determined.

From Baker: WILLIAM SMITH, Judge.

En Banc.   Statement by MR. JUSTICE BURNETT.

The plaintiff, the Service & Wright Lumber Company, a corporation, brings this action against the Sumpter Valley Railway Company, a corporation, alleging that the latter was a common carrier during the period between September 12, 1903, and May 27, 1906, engaged in the transportation of lumber, logs and other timber products between Whitney and Baker City, in Baker County, Oregon, and intermediate points.   It charges that during the period named, and in order to market the products of a mill it operated, plaintiff was compelled to and did ship over the defendant's railroad 879 cars loaded with lumber, laths, pickets and posts, aggregating 9,132½ tons, from what is known as Deer Creek Spur Intersection to Baker City, a distance of 23½ miles, and that, for the transportation of said mill products between the points named, the defendant demanded, charged and compelled the plaintiff to pay, and the defendant collected and received at plaintiff's cost, freight at the rate of 8.51 cents per ton per mile; the same being $2 per ton for said entire distance of 23½ miles.   The plaintiff, further complaining, avers that the charges mentioned were excessive and unreasonable and more than those demanded by the defendant from competing shippers over the same road for shipments of similar character, class of freight and cost of transportation during the same time.   It places the just and reasonable freight

charges that should have been imposed and paid at not to exceed 2.8 cents per ton per mile, or 65.8 cents per ton for the entire distance hauled.  The complaint further alleges rates charged to other competitors: One for logs from Whitney to South Baker, 46.4 miles, at 25 cents per ton; another for logs from Stoddard's Spur to Baker, 26¾ miles, at 62½ cents per ton; a third for lumber from Sumpter to Baker, 31.7 miles, $2 per ton; fourth, on lumber from Bennett's Siding to Baker, 10.3 miles, 70 cents per ton; and, fifth, on lumber from Salisbury Siding to Baker City, 9.8 miles, 70 cents per ton.  Finally, summing up, the plaintiff demands judgment against the defendant for $12,255.90 as the excess charged over and above what was reasonable to demand and receive for the service mentioned.

A motion to strike out all the allegations respecting the hauling of logs on the ground that the same was immaterial was overruled.  The court also denied a motion to require the plaintiff to state in his complaint whether the action brought was one for an excessive and unreasonable freight charged or whether it was based upon the discrimination made between charges exacted by the defendant from the plaintiff and those demanded by the defendant of other shippers on the line.  A demurrer was interposed assigning as causes that the complaint does not state facts sufficient to constitute a cause of action; that it sets forth in one count two separate causes of action, one for excessive freight charges exacted from the defendant, and another arising from discriminations between the plaintiff and other shippers; third, that it appears from the complaint that the cause of action is founded on sundry shipments during the period named, which the plaintiff has set forth in one count, whereas it should be required to state them in separate counts as arising from each shipment and bill of lading therefor; and, lastly,

that it appears from the complaint that the cause of action accrued more than three years prior to the filing of the original complaint, and that it was barred, therefore, by the statute of limitations. This demurrer was also overruled. The answer admitted the amount of freight in question to be 9,132½ tons but stated that it was contained in 880 cars, consisted of lumber only, 877 cars of which were destined for points without the State of Oregon and were delivered by plaintiff to the Oregon Railroad & Navigation Company for carriage to its destination, upon which the defendant received its regular freight charges from the connecting carrier, to wit, 10 cents per 100 pounds. The complaint is otherwise traversed in material particulars.

The substance of the first affirmative defense is that, as to the 877 cars which were destined for transportation and delivery to consignees outside of the State of Oregon, the defendant was employed as a carrier of interstate commerce; that, as required by the laws of the United States, it had promulgated and kept open for public inspection schedules showing rates, fares and charges for the transportation of interstate commerce, among which the defendant had established a rate of 10 cents per 100 pounds between all Sumpter Valley points and Baker City, Oregon, including Deer Creek Spur intersection, which was a Sumpter Valley point; that the rate named was a reasonable one, and by reason of the requirements of the law the defendant was compelled to and did charge that rate for the carriage of the plaintiff's lumber. The second affirmative defense was in terms much like the first except that it was so framed as to amount to a bar to the jurisdiction of the state court, alleging it to be a controversy over which that tribunal had no authority. The third affirmative defense was in substance that on May 6, 1907, the plaintiff corporation was dissolved in pursu-

ance of a resolution of its board of directors, and that the Secretary of State had issued a certificate of dissolution under that date, since which time the plaintiff has had no legal existence and had no power to sue or be sued. Lastly the defendant avers in substance that the matter complained of constituted interstate commerce, and that by the act of Congress approved February 4, 1887, and amendments thereto, the plaintiff should have presented his claim for excessive freight charges to the Interstate Commerce Commission within two years from the time the same accrued; and that by reason of its failure to thus present its claim to the commission all its rights, if any, were barred. The new matter of the answer is challenged by the reply, which pleading states that all matters complained of happened and accrued before the dissolution of the plaintiff corporation. It is further alleged that the carriage of plaintiff's property ended, so far as the defendant was concerned, at Baker City, where the goods were delivered to the plaintiff; the defendant relinquishing all control or management thereof to the plaintiff, who afterward at its own risk transferred the same to another carrier, substantially contending that the transaction with the defendant was merely preliminary and preparatory to the actual shipment of lumber to other states. A jury trial resulted in a general verdict in favor of the plaintiff, totaling $3,345.72. From a judgment for this amount in favor of the plaintiff the defendant appeals.

REVERSED.

For appellant there was a brief over the names of *Snow & McCamant* and *Mr. John L. Rand,* with an oral argument by *Mr. Zera Snow.*

For respondent there was a brief over the names of *Mr. Samuel White, Mr. Robert Service* and *Mr. Gus-*

*tav Anderson,* with oral arguments by *Mr. White* and *Mr. Service.*

MR. JUSTICE BURNETT delivered the opinion of the court.

1. The first question for consideration arises on the motion of the defendant to strike out the allegations about log rates paid by other parties and an exception to an instruction given by the court on that point as follows: "Evidence has been introduced pertaining to the matter of the freight rates charged by the defendant on logs as well as lumber, and it is for you to determine whether those commodities are of such like kind and character of freight as would admit of a similar or relative adjustment of a rate between them, and for this purpose you may consider, together with all other evidence touching that feature, the classification referred to as Western Classification, and defendant's modifications thereof, if any, introduced in evidence, and which it is stipulated was adopted by defendant and in force during the period in question, and whether or not these commodities were in direct competition; and, if you find that the said commodities were similar in kind and class and also competitive, then you are instructed that such rates should be so adjusted between them as not to favor one at the expense of the other, if thereby the rate on one becomes unreasonable as to the shipper of the other."

There were put in evidence, without objection, various tariff sheets of the defendant, each stating substantially that it was issued subject to the Western Classification and current rules and regulations of the company governing the transportation of freight, and providing that, where tariff and classification conflicted, the tariff would govern. Also, without objection, the Western Classification of freights was

introduced, so far as the same relates to timber prod-
ucts, among the items of which logs are classified as
subject to the lumber tariff rates.   It thus appears that
the defendant treated logs and lumber as belonging to
the same class of products, and this was tantamount to
an admission on its part, proper to go to the jury
upon the question of the reasonableness of the rates
charged for lumber.   The log is raw material in the
manufacture of lumber.   If one producer hauls his logs
over the defendant's road to a given point and there
manufactures them into lumber, he necessarily com-
petes with another millman who first saws logs into
lumber and afterward ships the finished product over
the same line of road.   In such an instance it is possi-
ble to prescribe so low a rate on logs on the one hand
and so high a rate on the lumber on the other, as to
give great advantage to the one who ships logs.   Hence
it is pertinent to consider the rate imposed upon one
class as affecting the reasonableness of the rate im-
posed on the other.   In this connection the defendant
asked the court in substance to state that the rate on
logs is not a criterion for determining the question of
the reasonableness or unreasonableness of the rate on
lumber, and that the defendant would have a right to
fix a different and less rate on raw material than the
rate fixed on a manufactured article, with the result
that the jury could not determine that the rate fixed
on lumber was unreasonable because a less rate had
been charged for the transportation of logs.   These in-
structions would have been misleading because they
make the standard of reasonableness depend solely
upon the physical character of the freight, whereas that
would be only one element going to make up the com-
posite standard of reasonableness.   The greater re-
sponsibility for transporting a highly finished product
over that involved in transporting raw material is one

element only of what may be considered a making up of a freight rate which shall be reasonable.

The motion to strike out parts of the complaint was based on the alleged reason that the matter attacked was immaterial. Enough has been said to indicate that the consideration of the rate charged on logs is *apropos* to the determination of the question of whether the rate on the finished product, lumber, was reasonable.

2. Bearing in mind that evidence may be given of the rate on the one in the consideration of the rate charged on the other, the statement on that subject in the complaint was merely redundant or a pleading of evidence. Redundancy not having been urged, the court was justified in overruling the motion made on the ground of its being immaterial. The lesser rate charged on a crude product is in the nature of an admission that it is reasonable, and consequently that the greater charge on the finished product is in a sense unreasonable. The weight of such testimony is for the jury.

3. Fairly construed, the complaint seeks to recover only for money had and received in the form of excess charges for freight. It does not in any sense purport to contain a cause of action for damages for discrimination between shippers. While the pleading is open to criticism, having redundantly stated evidence, it is not liable to the charge that it states two causes of action or joins them in one count. In an action to recover excess charges, the question of discrimination almost necessarily arises in the evidence, and it was not error for the court to overrule the demurrer on that ground.

4. It does not appear upon the face of the complaint that the action was brought upon various shipments of lumber on sundry bills of lading, which the plaintiff should state in separate counts. In this kind of action

it matters not that the money demanded may possibly have accrued as the sum of various items received at different times. It would be as logical to require a statement of a cause of action on each separate item of a running account: *Higley* v. *Burlington etc. Ry. Co.*, 99 Iowa, 503 (68 N. W. 830, 61 Am. St. Rep. 250). The court was not at fault in its ruling upon the demurrer on that point.

5. A certificate of the Secretary of State showing the dissolution of the plaintiff corporation on May 6, 1907, was introduced in evidence in support of the defendant's allegation in that respect. Section 6699, L. O. L., reads thus: "All corporations that expire by limitation specified in their articles of incorporation, or are dissolved by virtue of the provisions of Section 6701, or are annulled by forfeiture or other cause by the judgment of a court, continue to exist as bodies corporate for a period of five years thereafter, if necessary for the purpose of prosecuting or defending actions, suits or proceedings by or against them, settling their business, disposing of their property, and dividing their capital stock, but not for the purpose of continuing their corporate business."

It thus appears that, during a period of five years after conventional dissolution has been accomplished, the corporation still exists for the purpose of winding up its affairs, which of course includes necessary litigation. The only restriction imposed during that period is that it shall not continue its corporate business. The plaintiff was clearly within its rights in commencing this action.

6. If, as a matter of fact, there had been a neglect of some preliminary steps necessary to take in the way of employing attorneys or directing someone to institute the action, it would have been proper to urge it by a plea in abatement. That is the legal effect of the

answer in this respect. In any event, the matter is waived by answering to the merits: *Hopwood* v. *Patterson,* 2 Or. 49; *Harrison* v. *Birrell,* 58 Or. 410 (115 Pac. 141); *Callender Nav. Co.* v. *Pomeroy,* 61 Or. 343 (122 Pac. 758).

7. In connection with the contention urged by the demurrer that plaintiff's cause of action is barred by the statute of limitations, it is necessary to consider the history of railway legislation in this state. By the act of February 20, 1885 (Sess. Laws 1885, p. 38), it was made unlawful to charge or receive a less rate or higher rate of freight from one person than from another for like or contemporaneous service and in any event to charge greater rates than those in force on January 1st of that year. The carrier was required to adopt and keep posted its schedules of tariff showing its rates, fares and charges, and these compilations were to be prepared and posted on the first Monday of July and January of each year and were not to be changed during the six months to which they applied so as to charge a greater rate of freight than as thus prescribed. The legislative assembly in 1887 (Sess. Laws 1887, p. 30) established a railroad commission which it is contended superseded the statute of 1885 and so repealed it by implication. But the defendant further maintains that, inasmuch as the railroad commission law of 1887 and the act of February 20, 1889 (Sess. Laws 1889, p. 22), amendatory thereof, were directly repealed in 1898 (Laws [Sp. Sess.] 1898, pp. 1, 24), the act of 1885 was reinstated, and that, having established its maximum rate of 10 cents per 100 pounds, it *ipso facto* became a reasonable rate remaining in force until overturned by the Railway Commission now in existence. It is not necessary to decide whether or not the act of 1885 was thus revived. The hypothesis that the statute of 1885 was in full force

during the period mentioned in the complaint does not necessarily justify the plaintiff's contention that this is an action for a penalty or forfeiture which must be commenced within three years as required by Section 7, L. O. L. The statute of 1885 was a maximum rate law in that it forbade carriers to charge a greater rate in the first instance than that in force on January 1st of that year, or subsequently the rate promulgated for any stated period of six months. It was so construed in *State* v. *Rogers,* 22 Or. 348, 357 (30 Pac. 74). It prohibited rebates, drawbacks, preferences and combinations to evade the law and interdicted greater charges for a short haul than for a long one. Section 7 of that act declared these things to be unlawful, and states that anyone violating the precepts of the statute "shall forfeit and pay to the person or persons who may sustain damage thereby a sum equal to three times the amount of damage so sustained, to be recovered by the person or persons so damaged by suit in any proper court of competent jurisdiction." These injunctions of the statute do not refer to an unreasonable charge for freight. So far as that is concerned, the rate exacted might be the maximum permitted, or below the same, and yet be unreasonable. The action authorized by that statute would not cover the case alleged here, which is for money had and received. The statute of limitations referred to is not applicable to the present contention.

8. It follows, as a corollary, that a compliance with the statute of 1885 by posting its schedules showing a rate of 10 cents per 100 pounds on lumber between points mentioned would not affect this action or amount to a standard of reasonableness. Hence the court was right in giving this advice to the jury: "You are instructed that, in the matters pertaining to this action, the posting or publishing and filing of freight

tariffs, or list of freight rates by defendant is no evidence as to whether the rates so posted, published, and filed were reasonable or not." The statute of 1885, upon which the defendant relies in this action, gives no further effect to the posting of schedules than to require that subsequent charges shall not exceed those named in the schedules. It does not pretend to say that rates thus posted shall be considered reasonable or not, and the court would not have been justified in giving to such a posting, even if effectual, a greater sanction than that named in the act.

9. The defendant sought to have the jury instructed to the effect that, if a consignee of the lumber in question paid the freight in the first instance, the plaintiff could not recover for the overcharge unless it first took an assignment of a cause of action thereon from the consignee. The court refused to so instruct the jury but instead said to them: "If you find that the freight charges collected by the defendant were eventually paid by the plaintiff or deducted from the moneys due to the plaintiff, then you are instructed that the same was in law the payment thereof by the plaintiff."

The evidence on behalf of the plaintiff was to the effect that at its request the Oregon Railroad & Navigation Company paid to the defendant at Baker City the bills of the latter for freight over its road, carried them as advance charges, and collected them with its own at the final destination of the lumber in other states, whereupon the ultimate consignee of the lumber deducted from the invoice price of the lumber the total amount of freight charges, including that part accruing to the defendant, with the result that the overcharge became money that really belonged to the plaintiff. If as a matter of fact the Oregon Railroad & Navigation Company at plaintiff's request and acting for it paid the freight to the defendant, the method

adopted to reimburse the company paying the charges in the first instance cannot affect the case. In the action for money had and received, it is sufficient to show that, by any process which was treated by the parties as a money transaction, the defendant has received money, or its equivalent, which in equity and in good conscience belongs to and should be paid to the plaintiff, and this is true although the plaintiff may never have had actual manual custody of the specie in question: *Wagener* v. *United States Nat. Bank*, 63 Or. 299 (127 Pac. 778, 42 L. R. A. (N. S.) 1135), and authorities there cited.

10. Defendant predicates error upon the refusal of this instruction: "The jury is instructed that if, when the agreement was made with the Oregon Lumber Company for the use of the spur, the 10-cent rate, which was the rate disclosed on the tariff sheets of the defendant, was agreed to and Service expressed his satisfaction therewith, the plaintiff cannot recover in this suit"—and upon giving the following: "If you find from the evidence in this case that the freight rate charged the plaintiff and collected by the defendant on plaintiff's shipments of lumber during the period mentioned in the complaint was an unreasonable rate, then I instruct you that it makes no difference whether the plaintiff contracted with the defendant to pay the same or not, or whether the same was paid under protest or not, if plaintiff was compelled to ship over the railway of defendant." As applied to the evidence in this case, the deliverance of the court was a fair statement of the law.

Some cases are cited in support of the defendant's contention that a payment voluntarily made with the knowledge of all the circumstances cannot be recovered by the person making the payment. This is indeed true as a general rule, and it is possible if the

carrier and shipper are shown to have dealt with each other, understanding all the conditions and on even terms, that the latter may make a voluntary payment to the former which cannot be recovered. The great weight of authority, however, is against the unrestricted application of that principle where payments are made to a common carrier for freight; the reason being that the individual shipper does not deal at arm's length with the carrier or occupy an equivalent situation. On this point the language of Mr. Justice Stone in *Mobile & M. Ry. Co.* v. *Steiner,* 61 Ala. 559, 595, is well chosen. He said: ''Railroads have so expedited and cheapened travel and transportation, have so driven from their domain all competing modes of transportation, that the public is left no discretion but to employ them or suffer irreparable injury in this age of steam and electricity. They have their established rates of charges, and these the shipper must pay, or forego their facilities and benefits. To object or protest would be an idle waste of words. The law looks to the substance of things and does not require useless forms or ceremonies. The corporation and the shipper are in no sense on equal terms, and money thus paid to obtain a necessary service is not voluntarily paid, as the law interprets that phrase'': *Heiserman* v. *Burlington etc. Ry. Co.,* 63 Iowa, 732 (18 N. W. 903); *Peters* v. *R. R. Co.,* 42 Ohio St. 275 (51 Am. Rep. 814); *West Virginia Transp. Co.* v. *Sweetzer,* 25 W. Va. 434; *New Orleans & N. E. Ry.* v. *Louisiana Construction Co.,* 109 La. 13 (33 South. 51, 94 Am. St. Rep. 395, and note 420). Besides all this, the defendant does not here plead that the payment was a voluntary one and states no facts from which the court or a jury could draw such a conclusion.

11, 12. Over the objection of the defendant the court received evidence of a rate paid by the firm of Stoddard

Bros. between 1896 and 1900, three years prior to the time mentioned in the complaint, which rate was less than the amount charged for like service to the plaintiff. The court also gave this instruction in that connection: "There has been some evidence in this case tending to show that defendant charged Stoddard Bros., during a period of years prior to the time the plaintiff commenced its shipments, for a haul of 26¾ miles, a rate of $1.50 per thousand feet on lumber, and that it charged plaintiff on its lumber during that period mentioned in the complaint for a haul of 23½ miles 10 cents per hundred pounds. I instruct you that you have a right to consider this testimony in connection with all the other testimony in the case in determining whether or not the rate charged plaintiff was an unreasonable rate."

The court rejected the offer of two of defendant's tariff sheets filed with the State Railway Commission in March and December of 1907, showing the rate on lumber from Sumpter Valley points to Baker City to be 10 cents per 100 pounds. The defendant here predicates error on these two actions of the court, contending that the admission of the Stoddard rates charged during the period, three years prior to the time of which the plaintiff complains, were immaterial and irrelevant and not a subject to be considered in connection with the present contention, or if evidence of a former rate was admissible, by a parity of reasoning, evidence should be received of the subsequent rates arising from the tariffs of the defendant filed with the Railway Commission. If the Stoddard rates were less than those charged to plaintiff on lumber, they were analogous to an admission against the defendant's interest; the deduction being that, as the defendant would not likely charge less than was reasonable in its dealings with Stoddard Bros., the greater

rate exacted from the plaintiff was unreasonable. It is apparent that the railway of the defendant traversed the same country, over the same grades, and between the same points in its service for Stoddard that it did during the period mentioned in the complaint. Under these circumstances, we cannot say that the court erred or abused its discretion as to remoteness of time, and objection on this ground applies to the weight of the testimony rather than to its competency. On the other hand, the subsequent filing of greater tariff rates with the State Railway Commission was in the nature of a self-serving declaration so far as defendant is concerned. Besides, whatever the force the Railway Commission statute gave the filing of rates, it could not affect matters occurring prior to its enactment.

13. The bill of exceptions, in speaking of the testimony of Robert Service, a witness on behalf of the plaintiff, contains this recital:

"Witness then produced a letter dated July 5, 1905, written by John L. Rand to Hon. Joseph W. Fifer, Interstate Commerce Commissioner, Washington, D. C., which reads as follows:

"John L. Rand,

"Attorney at Law,

"Baker City, Oregon, July 5, 1905.
"Hon. Joseph W. Fifer, Interstate Commerce Commissioner, Washington, D. C.

"Dear Sir: Your favor of June 27th to Mr. Joseph Barton of the Sumpter Valley Railway Company, relating to the complaint made by Service & Wright Lumber Company, was duly received. The Sumpter Valley Railway Company owns and operates a narrow gauge railway between Baker City and Tipton, Oregon, a distance of about fifty miles, doing business exclusively within the state of Oregon, its entire line being within the territorial limits of the state. All goods

transported by the company are loaded and unloaded at Baker City, Oregon, in good faith and not as a device to evade the jurisdiction of the Interstate Commerce Commission. It has no connection or traffic contract with any other road, nor does it form a link of any other line. All goods shipped over its line are billed to and from Baker City. All goods received for transportation over its line, whether coming from without the state or not, are rebilled by this company from Baker City, for such points as they may be destined for. All goods received for shipment, whether destined for Baker City or beyond are billed to Baker City only, and are then turned over to the O. R. & N. Railway Company, upon that company advancing and paying to this company its charges for transportation over its line. This applies to car load lots or partial car load lots and to all goods of any nature whatsoever. This company has never, at any time, had any through bill of lading or joint bill of lading of any goods, with any other road or line whatever. There is no common control, management or arrangement between this company and any other road, either for a continuous carriage or shipment, or for any other purpose. Goods destined beyond Baker City, received for transportation by this company are billed to Baker City and the goods delivered there, and this company's liability ends at that point. Its charges are paid by the O. R. & N. Railway Company, and all goods received at Baker City, either from or going over this company's line are unloaded and reloaded at Baker City. The same service is and always has been rendered to the Service & Wright Lumber Company that has been rendered to all other persons engaged in that business. This company has a rule in operation that it will not receive or accept shipments of lumber destined to points beyond Baker City and requires all persons alike to receive all lumber so shipped, at Baker City, and to unload the same from its cars. If they then wish to ship to other points, they are all alike com-

67 Or.—6

pelled to reload onto the O. R. & N. Railway Company's cars. Mr. Service has had the same treatment that all other persons engaged in that business have had. Thanking you for your courtesy in the matter, I am,                    Yours very truly,

                              "JOHN L. RAND.

"Mr. Rand admitted that at the time he wrote the letter he was the attorney for the Sumpter Valley Railway Company, and the letter was received in evidence."

In that connection the court instructed the jury as follows: "The first question that confronts the jury in this case is: Were the shipments mentioned in the complaint of the plaintiff, other than the four local shipments made to F. L. Moore and plaintiff itself from Deer Creek Spur to Baker, interstate shipments, or were they intrastate shipments? If you find from the evidence that those shipments or any thereof were interstate and not intrastate, then as to those shipments you must find for the defendant, and a special finding is submitted to you upon that point. As to whether or not they were interstate shipments is a question of law depending upon the facts as you find them, and I instruct you that, if you find that the statements made in the Rand letter which has been offered in evidence are true and state the facts as they existed during the time the plaintiff was making those shipments, then such shipments were not interstate, and your verdict must depend upon the sole question: Was the rate charged plaintiff by defendant a reasonable one? But, if the said shipments were interstate, then you must so find and bring in a finding to that effect. As I have said, if you find that the Rand letter defines correctly the status of the business in which the defendant was then engaged and correctly sets forth its relations with plaintiff with reference to plaintiff's said

shipments, then those shipments were intrastate and not interstate, and you are then to determine only this question: Were the rates charged plaintiff reasonable? And if you find them unreasonable, to what extent they were unreasonable and excessive." The defendant excepted to this instruction.

It is admitted by both parties that, if the business in question was in fact interstate commerce, the plaintiff cannot recover in this action because the consideration of the reasonableness of a rate charged on that class of business is necessarily involved and belongs exclusively to the Interstate Commerce Commission of the United States courts, and that the action of Congress in that respect has ousted the state courts from authority over such matters. Considered as a matter of law, the letter embodied a very clear statement of the contention that the business in question was intrastate commerce, and the court was justified in adopting its language as a hypothesis to be submitted to the jury. The principal issue in the case was whether, as between plaintiff and defendant, this was traffic carried on entirely within the limits of the State of Oregon, or whether it was interstate commerce, and hence beyond the jurisdiction of the state court. The action of the court as to the Rand letter was equivalent to stating a supposed case to the jury as respects the facts and directing them as a matter of law that such a hypothesis, if true, would be an example of intrastate commerce. The court did not intimate to the jury that the statements in that letter were true or untrue. It left that feature to the jury.

14. There was evidence tending to show that all the lumber in question passed over the plaintiff's road under one of three forms of bills of lading issued by the defendant. The printed conditions in these bills of lading were substantially identical. They all required

the lumber to be transported from Deer Creek Spur, Oregon, to Baker City, Oregon. They were all signed by the defendant as the carrier and by the plaintiff as the shipper. In one form, under the head of "consignee, marks and destination," was inserted the name and address of a consignee outside of the State of Oregon. On a second form under that head was inserted the name of the plaintiff, with its address at Baker City, Oregon, and under the description of the article shipped was a notation, "Ship to Shoshone, Ida. Destination, Twin Falls, Ida." On the third form no name was inserted under the head of "consignee, marks and destination," but with the description of the articles was this notation, "Chicago Lumber & Coal Co., Oakley, Kansas." At the close of plaintiff's testimony the defendant moved to withdraw from the jury the consideration of all shipments evidenced by such bills of lading, amounting in all to 877 cars, but the court refused so to do, and the defendant assigns this as error. The theory upon which the defendant objects to this ruling of the court is that the bills of lading show upon their face conclusively that the shipments therein described were interstate commerce. This would be plausible if the bills of lading were the only testimony on that subject. There was other testimony tending to show that these notations were inserted in the bills of lading for the convenience of the shipper after the goods were delivered to its employees at Baker City, who there unloaded them from the defendant's narrow gauge cars and reloaded them upon standard gauge cars of the Oregon Railway & Navigation Company, and were not for the information or control of the defendant or any subsequent carrier. Moreover, it is laid down as a rule by the United States Supreme Court that bills of lading are not conclusive as to the character of the shipments: *Southern Pac.*

*Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498 (55 L. Ed. 310, 31 Sup. Ct. Rep. 279); *Railroad Commission* v. *Worthington,* 225 U. S. 101 (56 L. Ed. 1004, 32 Sup. Ct. Rep. 653); *Texas & N. O. R. R. Co.* v. *Sabine Tram Co.,* 227 U. S. 111 (33 Sup. Ct. Rep. 229). The court could not as a matter of law declare from the bills of lading alone that the business in question was interstate commerce, especially when there was testimony, as there was, tending to show that the shipment over the defendant's road to Baker City was merely ancillary or preparatory to a contemplated delivery to a nonresident consignee. The question was properly one that should be submitted to the jury.

15. A crucial question in the case was whether or not the transaction described in the complaint constituted interstate commerce. In addition to the instruction based upon the Rand letter, heretofore mentioned, the court presented the two sides of the question about whether or not the business was intrastate commerce or interstate commerce in the following language:

"In determining the question of what constituted interstate freight and what constitutes intrastate freight, I charge the jury that as to all cars of lumber shipped by the plaintiff, if the lumber in these cars has been in advance of shipment sold to parties outside of the state upon a delivery price at point of destination, and if when the freight started from the plaintiff's mill at Deer Creek Spur it was intended by both plaintiff and defendant that the same should be carried to Baker City and there transferred to standard gauge cars of the Oregon Railroad & Navigation Company, as a continuation of the Sumpter Valley haul, and by means of such cars it was to continue on its journey, and if the cars of freight so shipped were, in furtherance of the original intention existing at the time of the shipment from plaintiff's mill, transferred to the

Oregon Railroad & Navigation Company's cars at Baker City, whether actually transferred by the plaintiff or by the defendant, and if the cars in which the same had been so transferred were in fact carried by the Oregon Railroad & Navigation Company, or its connecting lines, to destination, and without the issuance of any further or other bill of lading therefor by the Oregon Railroad & Navigation Company, then I instruct the jury that as to all such freight it was interstate freight, and the freight charges which may have been paid thereon to the defendant for the part of the haul from the plaintiff's mill to Baker City cannot be recovered in this action.

"Now again as to the shipments of lumber that left Deer Creek Spur and went beyond the State of Oregon: So far as the Sumpter Valley Railway is concerned, those shipments may have been interstate or they may have been intrastate. It is to be determined by you from the evidence under these instructions. If plaintiff delivered a shipment to defendant at Deer Creek Spur for hauling to Baker only, and if that contract were made and executed as between the plaintiff and defendant just as it would have been had Baker been the final destination, or as if there were no other railway to be brought into the transaction, then the contract was for intrastate haul only, notwithstanding the fact that the railway company may have transferred and delivered the lumber to another company. If a shipment were accepted and made by the defendant under an agreement that concerned only plaintiff and defendant, if, as I have said, it was such a contract as might have been made and fully completed whether the Oregon Railroad & Navigation Company were in existence or not, then it was not interstate, even though the plaintiff then intended to send it on out of the state and was then filling an order for lumber received from without the state. I think that you understand what I mean in thus explaining it to you as you have heard it discussed so much during the trial and must realize

that the distinction is more easily perceived than expressed.   I may add this: If the contract to haul made by the Sumpter Valley Railroad Company did not contemplate the assistance of another line in execution of its own (the Sumpter Valley's) contract and was made and executed as though there were no other railway to be concerned in the execution of a part of the Sumpter Valley's own contract, then it was an intrastate and not an interstate haul, and you would take up the consideration of the reasonableness of the rates complained of by plaintiff.   If, however, such was not the case, if the contract to haul made by defendant was made in contemplation of the work of a connecting line and the undertaking of defendant that it would require such assistance and thus deliver such shipment outside the State of Oregon, then as to all such shipments the plaintiff cannot recover.   If the Sumpter Valley completed the services which it had agreed to perform, did fully what it agreed to do, without regard to, or leaning or calling upon, or hooking up with the Oregon Railroad & Navigation Company, and if its charges were for its services so rendered, regardless of what others participating in the haul which the shipper had in his mind when he started the lumber on its way might or would charge, those shipments would be state hauls only and not interstate.   We must let it go at that, for I think you will perceive the distinction, as I have previously said, better than I can express it.   In determining that question you will consider all the evidence showing the shipping relations between plaintiff and defendant and how they handled such shipments.   The mere fact that the stuff went out of the state does not settle that question.''

The defendant presented many requests to charge on this and kindred subjects, but the limits of an ordinary opinion forbid that they be inserted here.   While the intent of parties as to the ultimate destination of goods may be received in evidence, yet it is not con-

trolling in all instances as to whether or not the shipment is intrastate or interstate. It is one thing for a producer to assemble his goods at a shipping point, whether by rail, by wagon, by water, or by any other means of conveyance. If this all takes place within a state and the transaction is there concluded in good faith, it matters not that the shipper may contemplate a subsequent transportation of the goods into another state, nor that the intrastate carriage involved may be preparatory for the ultimate business of interstate transportation.

In *Coe* v. *Errol,* 116 U. S. 517 (29 L. Ed. 715, 6 Sup. Ct. Rep. 475), where the dispute was whether the logs involved were part of the common mass of taxable property within the state, although the owner contemplated sending them ultimately to another state for sale there, or whether they were at the time part of interstate commerce, Mr. Justice Bradley said: "When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an *entrepot* for that particular region whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to a common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state. * * It is true it was said in the case of *The Daniel Ball,* 10 Wall. 557, 565 (19 L. Ed. 999) : 'Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced.' But this movement does not begin until the articles have been shipped or started for transportation from the one state to the other. The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to

commence is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation for transportation. Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain. It may be sold or otherwise disposed of within the state and never put in course of transportation out of the state. Carrying it from the farm, or the forest, to the depot is only an interior movement of the property, entirely within the state, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation; it is no part of the exportation itself. Until shipped or started on its final journey out of the state, its exportation is a matter altogether *in fieri* and not at all a fixed and certain thing.''

On the other hand, if in fact a shipment is started in the first instance on a road wholly within a state for shipping as one entire carriage to another state, it would be interstate commerce, no matter what the parties might choose to call it. It is the relation sought to be established between the consignor and consignee that must govern the question. Whenever as an integral part of the delivery from the seller to the buyer, where one is in one state and the other in the other, transportation is inaugurated, the transaction at once assumes the nature of interstate commerce. In other words, where connecting lines of railway are under common control or management or have arranged among themselves for continuous carriage of goods from one state to another, as an ordinary movement of trade, and the owner of property for the purpose of delivering it on sale to a buyer in another state intrusts it to one of such carriers for transportation to the buyer, so that, by the usual movement of traffic under such control, management or arrangement, the prop-

erty will reach the purchaser, it becomes a part of interstate commerce on delivery to the first carrier although its line is wholly within the state where the shipment originated. The difficulty is in the application of this rule. The crux of the situation is to determine when the transaction of delivery from seller in one state to buyer in another actually begins. Mere preparation in good faith for such a transaction to begin in the future must be excluded from interstate commerce. This complicated question is one of mixed law and fact which must be left to a jury under proper instructions. We conclude on this branch of the case that the alternative was fairly submitted to the jury in this case.

16. It remains to consider the instruction of the court upon the subject of a reasonable rate. As before indicated, it was charged in the complaint and partially admitted by the defendant that, during the period mentioned in the complaint, the defendant hauled over its road for one of plaintiff's competitors lumber from Bennett's Siding to Baker City, a distance of 10.3 miles, at 70 cents per ton, and for another competitor from Salisbury to Baker City, a distance of 9.8 miles, for the rate of 70 cents per ton, which was less than a similar charge to the plaintiff. In other words, while the plaintiff was charged 8.51 cents per ton per mile, his competitors were charged respectively 6.8 cents and 7.14 cents. In this connection the defendant requested the following instruction: "The plaintiff claims that the haul for Bennett & Son and for the Oregon-Wisconsin Lumber Company at 70 cents per ton was a discrimination against plaintiff and that, on account of the amounts exacted from these two companies being less than the rate charged plaintiff, the rate charged to plaintiff was unreasonable. Touching this question, I charge the jury that the defendant had the right to fix a lower rate for Bennett & Son and

the Oregon-Wisconsin Lumber Company for a shorter distance, and which was not within the zone which had been established by the defendant for the plaintiff's shipments, if the rate made by the defendant for the less distance was made to meet a possible competition by a wagon haul of the product of Bennett & Son and the Oregon-Wisconsin Lumber Company." This instruction should have been given to the jury as exemplifying the principle that a lesser charge per ton per mile in one instance attended by competition justifies the greater charge per ton per mile in another instance not affected by competition as against an accusation of discrimination. Many factors enter into the consideration of what is a reasonable rate. Citizens who embark their capital in the public vocation of common carriers are entitled to a fair return upon their investment when it has been judiciously and honestly expended: *Smythe* v. *Ames,* 169 U. S. 466 (42 L. Ed. 819, 18 Sup. Ct. Rep. 418). They are entitled to meet competition and in so doing, where there is a condition of that kind arising, to make a less rate than it charges on other hauls. The question of competition, as well as grades, character of the shipment, whether raw material or finished product, the added responsibilities in the latter case, the wear and tear of equipment, and many other ingredients enter into the computation of what is a reasonable rate. In the nature of things it would be impracticable and unfair to lay down a mathematical rule of so much per ton per mile over all sections of any road. The court was in error in excluding this modification of such an inflexible rule.

17. Further, on the question of what would constitute a reasonable rate, the court instructed the jury as follows: "In determining the reasonableness of railway rates, consideration must be given, not only to the carrier (the railway company), but to the party re-

quiring its services. The carrier is entitled to adequate recompense for the service it performs, and the shipper is entitled to a rate that he can reasonably afford to pay for the services he requires. That rule should appeal to your minds as being exactly right as it is another way of saying that both shipper and carrier are entitled to absolute fairness each from the other in all their business relations. So I repeat: The carrier should be allowed fair compensation, and the shipper should be charged only what he can reasonably afford to pay for the services performed.''

In the matter of establishing reasonable freight charges, it is the relation between the carrier and the general public which is controlling. The individual has no right to control the situation except by virtue of his relation to the public. The individual cannot dominate the carrier in its private capacity any more than he can control other private interests. It is only through the relation which the carrier as a public servant bears to its master, the public in general, that the individual can affect it. One of the abuses which has called forth modern legislation on the subject of carriers was preferences given by the carrier to one shipper over another for like services. This was manifestly an exercise of partiality and consequently an injustice which legislation has sought to remedy. If it were unjust for a carrier to demand special rates from an individual shipper higher than those awarded to his competitors, it would be equally unjust for an individual to demand for himself lower rates than those demanded from his competitors. It is wrong for the carrier to charge as freight ''all the traffic will bear,'' and legislation has restrained such greed. It is quite as reprehensible for the shipper to demand of the carrier all its service will bear. The law wisely fixes reason and fair dealing as the standard governing the demands of both parties. What the individual can

afford to pay is not the standard by which the matter of freight charges is to be judged. Suppose that A. and B. were manufacturers of the same class of products, having their mills at the same shipping point; that A. has his raw material close at hand and easy of access, while B. is compelled to draw his raw product from distant sources, under adverse circumstances, not affected by the common carrier in any sense. Manifestly B. cannot afford to pay as much for the freight on his finished product as A. can, and it would be unlawful for him to demand that he should be favored in that respect by the carrier as against A. If that principle be admitted, discrimination would be canonized and uniform treatment of shippers would automatically cease; yet the court virtually enunciated that principle and repeated it in the excerpt quoted. In so doing it clearly committed error prejudicial to the defendant.

The judgment is reversed.         REVERSED.