Argued January 3, reversed February 26, rehearing denied May 21, 1918.

## SERVICE *v.* SUMPTER VALLEY RY. CO.

(171 Pac. 202.)

**Carriers—Bill of Lading—Interstate or Intrastate.**

1. A bill of lading is not conclusive of the character of the shipment as interstate or intrastate commerce, but it may be considered as a circumstance with other incidents of the transaction on the question; the issue being one of fact for the jury, unless the evidence is conclusive.

[As to the conclusiveness of bills of lading, see note in 30 Am. St. Rep. 634.]

**Trial—Instructions—Singling Out Evidence.**

2. Requested instructions, selecting particular pieces of testimony and charging the jury wholly thereon, when there are other circumstances proper for its consideration, is an invasion of the province of the jury.

**Commerce—Interstate Commerce—Common Control.**

3. Shipments over defendant's road wholly within the state were not necessarily interstate commerce, depending on whether the acts were done under a common control, management or arrangement for a continuous shipment from one state to another, merely because the lumber was destined for points outside of the state, as shown by notations on the bills of lading, and was at the terminus of defendant delivered to a connecting line and by it carried out of the state and delivered; and it paid defendant its charges for its haul.

**Carriers—Overcharges for Freight—Interest.**

4. Interest should not be allowed on a claim for overcharge in freight rates.

Abatement and Revival—Substitution of Parties—Effect After Reversal.

5. The substitution in the appellate court of parties for the plaintiff corporation, because of the expiration of the five years after its dissolution within which it could wind up its affairs, is only for the purpose of appeal, and so after reversal there must be a substitution in the trial court.

Abatement and Revival—Substitution of Parties—New Pleading.

6. Substitution in the trial court for a plaintiff corporation which has become defunct, of its stockholders, for which leave must be obtained, must be not merely by insertion of their names in the complaint, but by allegations therein showing their right to recover, on which defendant may take issue.

Appeal and Error—Objections Below—Want of Cause of Action.

7. Objection that the complaint does not state facts sufficient to constitute a cause of action, excepted by Section 72, L. O. L., from the grounds of objection that shall be deemed waived if not taken by demurrer or answer, may be made for the first time on appeal.

Appeal and Error—Objections Below—Want of Cause of Action.

8. Where names of parties are written into a complaint as substituted for plaintiff, without any allegations showing right in them to recover, the ground of objection, relative to right to raise it for the first time on appeal, is that the complaint does not state a cause of action, and not that the substituted parties have not legal capacity to sue, which applies to minority, insanity or the like.

Abatement and Revival—Substitution of Parties—Order—Effect.

9. An order of the trial court that certain persons are substituted as plaintiffs amounts to no more than permission to them to proceed in their own right, and does not dispense with necessity of their stating a cause of action in themselves.

Appeal and Error—Void Judgment.

10. Appeal may be taken from a void judgment.

Abatement and Revival—Remand on Appeal—Continuance of Action by Substituted Parties.

11. The greatest effect that a remand for new trial, after it appears that plaintiff corporation has become defunct, can have, relative to right to continue the action by substitution of the corporation's successors in interest as plaintiffs, is to extend to such time the commencement of the year limited by Section 38, L. O. L., for allowing the same.

From Baker: DALTON BIGGS, Judge.

In Banc.

The Service & Wright Lumber Company, a corporation, commenced an action against the defendant Railway Company on September 11, 1909, to recover what

the former claimed was an excess over what was reasonable which was charged to and paid by it on lumber transported by the defendant for the plaintiff between Deer Creek Siding and Baker, in Baker County, Oregon. From an adverse judgment the defendant appealed and secured a reversal in an opinion reported in 67 Or. 63 (135 Pac. 539). A second trial in the Circuit Court again resulted in a judgment for the plaintiff and on appeal the action was dismissed on the ground that as the record disclosed the plaintiff corporation had been dissolved more than five years prior to filing the amended answer stating that fact: 81 Or. 32 (149 Pac. 531; 152 Pac. 262; 158 Pac. 175). At this juncture Robert Service and others, urging substitution for the first time, applied to this court to be substituted for the original plaintiff corporation which had been dissolved as hereinafter stated, and by an *ex parte* affidavit gave as grounds therefor that all the debts of the concern had been paid and that they were its only stockholders. On this showing they were substituted and their motion for a rehearing in this court was granted. The judgment of the Circuit Court was again reversed for the reasons stated in the first opinion.

We here set down the chronology of this litigation as follows: The alleged cause of action in favor of the original plaintiff corporation accrued May 27, 1906; the resolution of its stockholders to dissolve it was adopted May 3, 1907; the Secretary of State issued his dissolution certificate May 7, 1907; the original action was commenced September 11, 1909; the first judgment of the Circuit Court was rendered November 3, 1911; the defendant's first appeal was perfected April 29, 1912; the period of five years from the dissolution of the corporation ended May 7, 1912; the original

reversal of the cause on appeal to this court was rendered September 30, 1913; the second Circuit Court judgment was entered January 9, 1914; the action was dismissed in this court June 15, 1915; the petition of Robert Service and others to this court to be substituted was allowed October 22, 1915, and the cause was set for rehearing; the original opinion of September 30, 1913, was adopted and the judgment was reversed June 20, 1916; the judgment from which the present appeals were taken was rendered in the Circuit Court December 22, 1916, and both parties appealed.

REVERSED ON DEFENDANT'S APPEAL.

For appellant-defendant there was a brief over the names of *Mr. John L. Rand* and *Messrs. Snow, Bronaugh & Thompson,* with oral arguments by *Mr. Rand* and *Mr. W. Lair Thompson.*

For respondents-plaintiffs there was a brief with oral arguments by *Mr. Samuel White* and *Mr. Robert Service.*

BURNETT, J.—On the appeal of the defendant there are three questions to be treated: 1. Whether and to what extent the question of interstate commerce is involved in this case; 2. The correctness of the Circuit Court's instruction to the jury to the effect that if they found for the plaintiff they should allow interest from May 27, 1906, to the date of the verdict; and 3. Whether the stockholders of the original plaintiff corporation have been properly substituted therefor so as to maintain this action.

· So far as the first question is concerned it is embodied in the defendant's assignments of error numbered 3, 4 and 5. Under the third assignment it con-

tends that the court erred in refusing to give this instruction:

"The jury is instructed that eliminating the four local shipments to which your attention has been directed, the bills of lading issued by the defendant for all shipments prior to the 5th of May, 1905, were contracts for interstate transportation, and that under the provisions of the act of Congress approved February 4, 1887, and the acts amendatory thereof, and the decisions of the federal courts defining the meaning of these acts, plaintiffs cannot recover for any freight paid to the defendant for the transportation called for in said bills of lading."

The fourth and fifth assignments predicate error upon the court's refusal to give instructions 21 and 22 requested by the defendant and here set down as follows:

21. "The plaintiff Robert Service has testified that the bulk of the contents of 800 of the cars which came down over the line of the defendant from Deer Creek Spur to Baker was transferred on arrival at Baker to broad-gauge cars in which the lumber left the state of Oregon for shipment to consignees from whom the Service & Wright Lumber Company had received orders. I instruct you that the carriage of the shipments of lumber referred to in the foregoing testimony was interstate commerce, and that under the provisions of the act of Congress approved February 4, 1887, and the acts amendatory thereof and the decisions of the federal courts defining the meaning of the said acts of Congress plaintiffs cannot recover for any freight which may have been paid on any of the said 800 cars."

22. "The plaintiff Robert Service has testified that the bulk of the contents of 800 of the cars which came down over the line of the defendant from Deer Creek Spur to Baker was transferred on arrival at Baker to broad-gauge cars in which the lumber left the state of Oregon for shipment to consignees from whom the

Service & Wright Lumber Company had received orders. I instruct you that under this evidence the bulk of the contents of the 800 Sumpter Valley cars referred to which were transferred to the broad-gauge cars and went out of the state of Oregon were carried in interstate commerce, and that plaintiffs cannot recover in this case for any freight which the Service & Wright Lumber Company may have paid for the carriage from Deer Creek Spur to Baker of the bulk of the said 800 cars so transferred. I instruct you that the provisions of the act of Congress of date February 4, 1887, regulating interstate commerce and the acts amendatory thereof and the decisions of the federal courts defining the meaning of these statutes preclude the recovery by plaintiff of any freight so paid by the Service & Wright Lumber Company.''

At all the times mentioned in this litigation the defendant owned and operated a railway from Baker, in Baker County, Oregon, to a terminus west of that town, all within the State of Oregon. The shipments in question were made from what is known as Deer Creek Spur to Baker. It is conceded that four carloads of lumber never went beyond the latter point, but were disposed of to the local trade there. Some evidence is in the record also to the effect that at least the bulk of the contents of 800 of the defendant's cars was immediately shipped out of the state by another railroad passing through Baker; and that when the cars of the defendant arrived there laden with the lumber of the Service & Wright Lumber Company the agents of that corporation took charge of the lumber and loaded it upon cars procured by it from the other railroad company upon which it was shipped out of the state. Mr. Robert Service, the principal witness for the plaintiff, testified to the effect that in every instance when any of the lumber in question arrived at Baker in the defendant's cars it was set or spotted on the track where

it was unloaded or where portions of it could be transferred and, as soon as it was spotted, the plaintiff corporation by its agents, took charge of it, had complete control of it, sold it in Baker if it wished or shipped it wherever it pleased and did with it as it wanted to. There is in evidence, as shown by the bill of exceptions, a letter of the defendant company written by its general passenger and freight agent addressed to the original plaintiff corporation as follows:

"Baker City, Oregon, April 24, 1905.

"Service & Wright Lumber Co.

"Baker City, Oregon.

"Gentlemen:

"Replying to yours of the 20th inst.: The transfer of lumber from our cars to standard gauge cars, and the selection of those standard gauge cars for such transfer purposes, has been entirely with yourselves for a long time past. You have made your shipments from mill on Deer Creek to Baker on our cars. At Baker you have made requisition upon O. R. & N. Co. for such standard gauge cars as you saw fit, and when such cars were designated to us by O. R. & N. Co. yardmaster, we have spotted them convenient to your lumber, on our cars, for transfer. When the transfer was made by you, we were notified and the standard gauge car loaded was and has been set over on O. R. & N. Co. tracks by our switch crew. We have assumed no responsibility whatever for the lumber in any manner, except to move it over to O. R. & N. tracks when notified by you to do so, after its arrival at Baker.

"We are under no obligations to transfer lumber, or any other shipment, as a matter of fact, from our tracks to O. R. & N. Co. or *vice versa*. We agree to responsibility for its arrival at Baker station, but our responsibility then ceases. We have no contract with the O. R. & N. Co. by which we can demand any certain kind or number of cars, or at any particular time or day. We cannot, and will not, agree to assume any responsibility for lumber shipments transferred from

our cars to standard gauge cars, or for losses or damages arising from overweight, underweights, less than minimum charge shipments; or from any cause whatever, from the time such shipments are received by us at Baker and expense bills or freight charges made out. If you make a shipment of lumber of such lengths, sizes and quantities that it is next to impossible to transfer to a standard gauge car, unless such car is of a size that calls for a minimum weight over and above the actual weight of lumber,—that will be your loss—if any such there be, and not ours.

"We will not agree to, or be responsible for, securing from O. R. & N. Co. any particular kind or class of car, small or large, box, flat or stock, for transfer purposes for any particular lumber shipment, to go forward at any particular time or date, or to contain any certain quantity in weight or measurement of lumber; but will use, handle and place in position for transfer purposes such cars, and only such cars as may be designated and set off on joint tracks for our use by O. R. & N. Co. yardmaster. In short, we do not propose to assume any risk or liability for matters which we cannot control or direct. The securing or providing of standard gauge cars of any particular kind for transfer purposes is one of the matters we cannot control or direct.

"It is my understanding that for some time past you have made direct demand of O. R. & N. Co. for such cars you have needed from time to time, it being agreed and understood that you should do so, in order that we could not properly be accused of not assigning to you an equitable number and kind of cars, that were turned over to us by O. R. & N. Co. I supposed that matters were working along smoothly, and that all causes—supposed or real—for dissatisfaction removed.

"We positively refuse to make any change to present arrangements that will, or may, bring a liability to us, for loss or damage resulting from any act done or performed by any person, our employee or other-

88 Or.—36

wise, during the act of transfer from our cars to standard gauge and delivery of same to O. R. & N. Co.

"Yours truly,
"SUMPTER VALLEY RAILWAY Co.
"Per JOSEPH BARTON, G. P. & F. A."

Another letter from general counsel for the defendant to a member of the interstate commerce commission was also put in evidence over defendant's objection. This letter appears at large in 67 Or., p. 80 (135 Pac., p. 545), reporting the first opinion in this case, and need not be here repeated. It is sufficient to say of it that it constitutes a strict disclaimer on the part of the defendant that it was engaged in or concerned with interstate commerce so as to be subject to the jurisdiction of the interstate commerce commission.

Of the bills of lading alluded to in the first quoted instruction requested by the defendant it is enough to say that they all required lumber to be transported from Deer Creek Spur, Oregon, to Baker City, Oregon. They were all signed by the defendant as the carrier and by the plaintiff as the shipper. The printed conditions in all of them were substantially identical. On one form, under the head of "Consignee, Marks and Destination," was inserted the name and address of a consignee outside of the State of Oregon. On a second under the same head was put in the name of the original plaintiff corporation with its address at Baker City, Oregon, and under the description of the article shipped was a notation, "Adams-Pilgerrin Co. Ship to Shoshone, Ida., Destination, Twin Falls, Ida." On the third no name appeared under the head noted, but with the description of the article were these words, "Chicago Lumber & Coal Co., Oakley, Kansas."

1. The substance of the defendant's contention is that on such bills of lading and the testimony alluded

to in the requested instructions the Circuit Court ought as a matter of law to have decided conclusively that the transaction was interstate commerce, which would oust the state court of jurisdiction. It is conceded by both parties that if in very truth the shipments in question were part of commerce between the states any dispute or any question in relation thereto must be determined by the interstate commerce commission in the first instance and not by the state court. The question with which we are concerned at present is whether on the record before us the question of interstate commerce is purely one of law to be declared by the court peremptorily. It is indeed true that the construction of contracts and the declaration of their legal effect is the exclusive province of the court; but it is equally true that on federal questions where the United States courts have construed congressional enactments the state courts are bound to follow the same. As to the first instruction the question is whether the court should say as a matter of law that the bills of lading as described above were conclusive on the nature of the transaction making it interstate commerce beyond cavil. We might content ourselves with the decision on this point when the case was before us in *Service & Wright Lumber Co.* v. *Sumpter Valley Ry. Co.*, 67 Or. 63, 84 (135 Pac. 539); but counsel have again presented the matter with an array of authorities which we have studiously examined and here review:

The decision in *Atchison, T. & S. F. Ry.* v. *Harold,* 241 U. S. 371 (60 L. Ed. 1050, 36 Sup. Ct. Rep. 665), was rendered June 5, 1916. The case involved a carload shipment of corn from Yanka, Nebraska, to Topeka, Kansas, in care of the plaintiff. An interstate bill of lading was issued. While the corn was in tran-

sit over the Union Pacific Railway the holder surrendered the bill of lading to an agent of the Santa Fe in Kansas City, Missouri, and took another bill treating the car as being at the latter place though, in fact, it was yet in transit to Topeka. The Supreme Court of the United States looked past the terms of both bills and classed the shipment as interstate because (1) the firm to be notified of the shipment was at Kansas City, Missouri; (2) there was no person at Topeka to whom the same was consigned; and (3) the first bill having the direction "C/o S. F. for shipment," it was apparent that the movement was not intended to stop at Topeka, but that it should go farther as directed by the indorsee of the first bill of lading while in transit. There was no intrastate bill of lading in the case. The same court, on June 10, 1913, decided the case of the *Railroad Commission of La.* v. *Texas & Pac. Ry.,* 229 U. S. 336 (57 L. Ed. 1215, 33 Sup. Ct. Rep. 837). That was a suit in the United States courts to enjoin the enforcement of penal orders of the state railway commission of Louisiana. Certain logs and staves were delivered to railways at various points in Louisiana consigned to parties in New Orleans who were engaged in exporting such stuff to Europe. The railway transportation was wholly within the state and the bills of lading were all intrastate. The shipments passed through the hands of two railway companies and by the order of the consignees were delivered at New Orleans directly to steamers plying to European ports. The property was all the time in the physical custody of the transportation companies and not within that of the consignees. No demurrage was charged for delay beyond the four days free time allowed by the state railway commission for intrastate shipments and they all paid the usual charges for

handling in transshipment to foreign exports. The merchandise was intended by the shippers for foreign export. The pith of the decision was in these words:

"The principle enunciated in the cases was that it is the essential character of the commerce, not the accident of local or through bills of lading which determines federal or state control over it; and it takes character as interstate or foreign commerce when it is actually started in the course of transportation to another state or to a foreign country. The facts of the case at bar bring it within the ruling."

The court sitting in equity assumed, as it had the right, to decide the fact and held that it was not concluded as a matter of law by the terms of the bills of lading in determining whether it was interstate or intrastate commerce. In 1913 the *Texas & N. O. R. Co.* v. *Sabine Tram. Co.*, 227 U. S. 111 (57 L. Ed. 442, 33 Sup. Ct. Rep. 229), was decided. That also was a trial by the court. The lumber was shipped from Ruliff to Beaumont by one railroad and thence by another to Sabine on intrastate bills of lading. On arrival at Sabine, by direction of the firm that had bought the lumber en route by paying draft with bills of lading attached, the loaded cars were at once run on about one quarter of a mile beyond the railroad station to a dock where the lumber was unloaded within reach of ship's tackle by which it was taken aboard as cargo for foreign export. The court considered the usual course of business connected with such shipment, and the fact that the parties took advantage of the longer free time allowed for moving foreign exports from cars to ships over that for handling domestic freight. It was held that the facts that the bills of lading were wholly intrastate and the railroad transportation entirely within the State of Texas were not controlling

in the matter. In other words, a construction of the bills of lading was not decisive of the character of the shipment, whether interstate or intrastate. The *Denver & R. G. Ry. Co.* v. *Interstate Com. Commission,* 195 Fed. 968, was decided April 9, 1912. The Missouri Pacific Railway carried a carload of beer from St. Louis, Missouri, to Pueblo, Colorado, on its local waybill, charging its own local rate. The waybill showed Baer Bros. Merc. Co. as consignee, and Leadville, Colorado, as the destination of the shipment. At Pueblo the car was put on an interchange track where the Missouri Pacific and Denver & Rio Grande delivered carload traffic to each other. The former road then delivered to the latter a transfer sheet showing consignor, point of shipment's origin, weight and contents of the car, together with the name of consignee and destination. The latter road then took the car and moved it to Leadville on a local waybill of its own, charging its own freight rate separately and also noting consignor, consignee and destination, together with the back charges of the Missouri Pacific. The usual course of business was for each road to collect for the other all the latter's unpaid charges or, if charges were prepaid, for the collector to account to the other, all being subject to daily settlement. Notwithstanding the D. & R. G. operated only within Colorado on its own local waybill and had no joint rate with eastern connections for Colorado points, yet the commerce court disregarded the local waybill under which the D. & R. G. operated and held that the facts showed interstate commerce. The proceeding was a suit in which all the issues were determined by the court, and turned upon a question of fact, not upon a legal construction of the waybill. It is said in *Pennsylvania Ry. Co.* v.

*Clark Bros. Coal Min. Co.,* 238 U. S. 456 (59 L. Ed. 1406, 35 Sup. Ct. Rep. 896), decided in June, 1915:

"In determining whether commerce is interstate or intrastate, regard must be had to its essential character. Mere billing, or the place at which the title passes, is not determinative."

What is known as the "lake cargo" coal case, *Railroad Commission* v. *Worthington,* 225 U. S. 101 (56 L. Ed. 1004, 32 Sup. Ct. Rep. 653), decided in 1912, was where the railroad commission of Ohio undertook to fix railroad rates for transportation of coal from interior points in that state to coal-bunkers at Huron, Ohio, to be transported by steamers to other states as required. The court said:

"The question is, then, one of fact. * * It is true that the shipper transports the coal ordinarily upon bills of lading to himself, or to another for himself at Huron on Lake Erie. The so-called 'lake cargo coal' is necessarily shipped beyond Huron. If it stops there another and higher rate applies."

The court then considered the circumstances of a lower rate applied to the transportation, including the loading on the steamers and trimming the cargo, whenever the coal went out of the state. The court disregarded as not conclusive the fact that the coal was billed only to Huron and distinguished *Gulf, C. & S. F. R. Co.* v. *Texas,* 204 U. S. 403 (51 L. Ed. 540, 27 Sup. Ct. Rep. 360), involving a shipment of corn between two points in Texas where the court held that the interstate transportation from another state had been completed under a contract to deliver the corn at Texarkana, Texas, and that when sold there the buyer's shipment of it to Goldthwaite, Texas, constituted a new, independent intrastate shipment. *Texas & Pac. Ry.* v. *Langbehn* (Tex. Civ.), 158 S. W. 244, decided in

1913, also ignores local bills of lading as nonconclusive. *Galveston, H. & S. A. Ry. Co.* v. *Carmack* (Tex. Civ.), 176 S. W. 158, decided in 1915, involved a shipment of horses from Alpine, Texas, destined to Little Rock, Arkansas. The court there said:

"There is no merit in the contention that it was an intrastate shipment. The fact that the appellant (common carrier) only obligated itself to transport the animals to San Antonio does not affect the interstate character of the shipment. It was clearly interstate in its nature."

In 1911 was decided *Southern Pac. Terminal Co.* v. *Interstate Commerce Comm.,* 219 U. S. 498 (55 L. Ed. 310, 31 Sup. Ct. Rep. 279). The Terminal Company had some docks at Galveston forming a connecting link in transportation of freight from interior Texas points to the seaboard and thence by ship to other states and countries. It did not charge defendant Young the same dockage rates as it did others in handling oil cake and meal, but leased to him one of the piers at such an annual rental that he was enabled to make a profit of 30 or 40 cents per ton of such produce over the average gain of his competitors in such transaction. In a suit by the interstate commerce commission to enjoin operations under the lease as discriminative on the part of the Terminal Company it was urged that the transportation was not interstate commerce and that the commission therefore had no authority in the matter because, among other reasons, the oil cake was hauled to the Galveston docks on intrastate waybills only, there unloaded, ground into meal and sacked for water carriage. The court considered all the circumstances affecting the business, including the fact that the premises on which the docks were located had been dedicated substantially for the

establishment of terminal facilities for certain railroad and steamship systems. The court refused to be bound by the construction of the local bills of lading under which the products were brought to Galveston and found from all the evidence as a fact that the transactions constituted interstate commerce. *Lusk* v. *Atkinson,* 268 Mo. 109 (186 S. W. 703), decided in 1916, was a proceeding to review the action of the Missouri Public Service Commission fixing the rates to be charged on shipments of ties gathered at various points in that state, carried by railroad to a station called Commerce and afterwards sent into other states to fill contracts for delivery there. Disposing of the contention that the business was not interstate commerce, after reviewing the precedents, the Supreme Court of Missouri in that case said:

"In order to determine this question it is important and necessary to ascertain: 1. What was the motive or intention of the shipper? 2. And what was the object and purpose to which the shipment was devoted? These two tests necessarily determine the nature of the shipment as being interstate or intrastate and they were had in mind in each of the foregoing cases wherein the court passed upon that question."

It is hornbook law that intent and purpose are always questions of fact. In 1916 was decided *Alabama Great So. Ry.* v. *McFadden,* 232 Fed. 1000. The case was decided on a rule for judgment for want of sufficient affidavit of defense. The facts were admitted, in substance, that loose cotton was bought by the defendants at various points in Alabama and shipped on local bills of lading to Birmingham, Alabama, for compression, when it was shipped on new bills of lading to New Orleans. The through rate allowed from Albertville, the origin of the shipment, to New Orleans

was 57 cents per hundred. The local rate from Albert-
ville to Birmingham was 11 cents and from Birming-
ham to New Orleans 32 cents, a total of 43 cents, which
defendants were told by plaintiff's agent was the cor-
rect one and which they paid. The railroad company
brought action to recover the difference between 57
cents, the rate established by the interstate commerce
commission, and 43 cents, actually paid. The court
disregarded the local waybills and considered all the
circumstances as questions of fact. On appeal to the
Third Circuit Court of Appeals the affirmance of the
decision of the District Court was made largely to de-
pend upon the fact that the cotton remained all the
time in the custody of the carrier who unloaded and
compressed it, under a provision of the bill of lading
giving it that privilege, after which it continued the
transportation. The decision attaches a great deal
of importance to the fact that the shippers did not, as
they might, take the cotton into their possession at
Birmingham, the terminal named in the intrastate bill
of lading: *McFadden* v. *Alabama Great So. Ry. Co.,*
241 Fed. 562.

We recall the testimony in the case at bar to the
effect that when the lumber arrived at Baker the origi-
nal plaintiff corporation took physical custody of it
and had complete control of it. The clear effect of
the opinion in the case last cited is to make such evi-
dence sufficient to take to the jury the question of fact
involved in determining whether the transaction was
one of interstate commerce. In 1891 was decided *Cut-
ting* v. *Florida Ry. & Nav. Co.,* 46 Fed. 641. This was
a suit in equity where the interveners besought the
court to direct its receiver of an insolvent railroad
company to return the excess of what he had charged
over the rate fixed by the state railroad commission

on shipments of oranges from points within the state to another intrastate point and thence to other states. The court laid aside as negligible the local bills of lading and held that where the fruit was shipped to plaintiff's agent at a point within the state and he, without taking custody of it, merely had it rebilled to consignees in other states, the business was interstate commerce notwithstanding the local bills of lading. *Swift & Co.* v. *United States,* 196 U. S. 375 (49 L. Ed. 518, 25 Sup. Ct. Rep. 276), decided January 30, 1905, was a suit to restrain repeated violations of the law against unlawful combinations in restraint of trade. The bills of lading were not considered. The court there held that when, as in that case, cattle are shipped from one state to another without change or delay except enough to secure a buyer at some stockyard en route, and when this is a typical, constantly recurring course of trade it constitutes interstate commerce at least where a resident of one state purchases from an inhabitant of another. In April, 1887, the case of *Ex parte Koehler,* 30 Fed. 867, was decided by the late Judge Deady. It involved a petition to instruct the receiver of the Oregon & California Railroad Company in respect to his duty. The Oregon Railway and Navigation Company's steamers carried freight from San Francisco, California, to Portland, Oregon, where the receiver took it and carried it over the railroad wholly within the state to its ultimate destination on its own bills of lading. Each carrier fixed and collected its own charges independent of the other and they were not under a common control or management. The learned judge decided that:

"So long as the railway and steamer are each operated under a separate and distinct control, making its own rates, and only liable for the carriage and safe

delivery of the goods at the end of its own route, the act does not apply to the transaction. To make these carriers subject to the act, the railway and vessel must, as therein provided, be operated or used under a 'common control'—a control to which each alike is subject and by which rates are prescribed and bills of lading given for the carriage of goods over both routes as one.''

About ten years later was handed down an opinion in *United States* v. *Colorado & N. W. Ry. Co.*, 157 Fed. 321 (85 C. C. A. 27, 13 Ann. Cas. 893, 15 L. R. A. (N. S.) 167). It was a case to recover a penalty for violation of the federal safety appliance act. Judge Sanborn points out that the construction of the interstate commerce act does not affect the construction to be given to the safety appliance law. He indicates two classes of carriers operating within a single state and engaged in transporting articles of interstate commerce:

a. ''Those who conducted that transportation with another or other carriers under a common control, management or arrangement for a continuous carriage or shipment; b. Those who conducted such transportation alone, or with other carriers without any common control, management or arrangement for such a carriage or shipment.''

He then shows that the interstate commerce law applies only to the first class, while the other act includes both; that the two enactments are not *in pari materia* because the first relates to contracts and rates of transportation while the second has reference to the construction of the cars and engines employed to carry interstate commerce in any form. The evils attacked in the former were favoritism and discrimination in contracts for carriage while those in the latter were injuries to employees on account of defective car

equipment.    The case is not an authority on matters involved in the one at bar.    In *United States* v. *Illinois Terminal R. Co.,* 168 Fed. 546, decided in 1909, there was an indictment for transporting interstate commerce without filing its schedule of rates with the interstate commerce commission.    The defendant's road was wholly within the State of Illinois, but by its plea of guilty it admitted that it was hauling shipments of merchandise moving entirely by rail on a continuous passage from one state to another.    *Louisville & Nashville R. Co.* v. *Behlmer,* 175 U. S. 648 (44 L. Ed. 309, 20 Sup. Ct. Rep. 209), was decided in 1900.    On shipments of hay from Memphis, Tennessee, by various roads through Summerville, South Carolina, to Charleston, South Carolina, the participating roads shared in a rate common to Summerville and Charleston, but for the shorter route to Summerville there was added to this and exclusively appropriated by the local road the rate from Charleston back to Summerville. It was held to be interstate commerce subjecting the charges to revision by the interstate commerce commission because the entire transportation was continuous by railways operating under a common arrangement for through traffic.    A similar case is that of the *Cincinnati, N. O. & Tex. Pac. Ry.* v. *Interstate Commerce Commission,* 162 U. S. 184 (40 L. Ed. 935, 16 Sup. Ct. Rep. 700), decided in 1896.    In the latter case the plaintiff in error operated a railway from Cincinnati, Ohio, to Chattanooga, Tennessee.    The Western & Atlantic Railway Company owned a road extending southerly from Chattanooga to Atlanta, Georgia, and from there the Georgia Railroad Company operated a third line easterly through Social Circle to Augusta, Georgia, the latter road being entirely within the limits of that state.    The three roads made a common

joint rate of $1.07 per hundred from Cincinnati to either Atlanta or Augusta, which they divided among themselves in certain proportions. For shipments from Cincinnati, Ohio, to Social Circle, $1.37 was charged, being the $1.07 to Atlanta, which it divided between the first two roads to the exclusion of the last one, which collected an additional 30 cents for its own use which was its state established rate on shipments originating at Atlanta and sent to Social Circle. The court held that whether the Georgia company was engaged in interstate commerce depended upon whether what it did was done "under a common control, management or arrangement for continuous carriage or shipment." Under the interstate commerce law as it then stood it was held in that case to be competent for a local road situated entirely within a state to haul freight coming from another state and that, too, independent of any control except that of its home state, provided its transportation was undertaken in good faith as a new and independent enterprise. On the other hand, if the local road had elected to become a party to a contract or arrangement with roads in other states to carry foreign freight by agreeing to receive the goods on foreign through bills of lading and to participate in through rates it thereby made its trackage part of a continuous line for the carriage of a through shipment and so became amenable to federal control under the interstate commerce law. In 1908 appeared the opinion of the interstate commerce commission in *Laning-Harris Coal & Grain Co.* v. *Missouri Pac. Ry.,* 13 I. C. C. Rep. 154. The plaintiff shipped two cars of coal from Springfield, Illinois, to Kansas City, Missouri, via the Wabash Railway and after arrival at the latter place forwarded both of them by the Missouri Pacific Railway to points in Kansas. The

through joint rate from Springfield to the Kansas points was $3.73, while the sum of the local rate from Springfield to Kansas City plus that from Kansas City to Kansas points was $3.50. The two roads charged the higher through rate. The commission considered the intent of the shipper in determining the rate applicable and awarding reparation for excessive charges and said:

"From the facts it is clear that the complainant intended these as strictly local shipments and no evidence was offered by defendant to controvert this contention. It is true that complainant was unable to say positively whether or not these particular cars of coal had been sold by it prior to the time they reached Kansas City, but it is a fact that no orders were given to the defendant to carry the coal to any other points until after it had actually reached Kansas City. * * The billing of both shipments here concerned was to Kansas City. * * They might have been held there, the cars unloaded and the coal sold at Kansas City."

As a question of fact the commission found that the transportation was composed of two local shipments and applied the local rates instead of the established joint one. In *In re Through Routes and Through Rates,* 12 I. C. C. Rep. 163, a section of the syllabus reads thus:

"Existence of a through route is to be determined by the incidents and circumstances of the shipment, such as the billing, the transfer from one carrier to another, the collection and division of transportation charges, or the use of a proportional rate to or from junction points or basing points. These incidents named are not to be regarded as exclusive of others which may tend to establish a carrier's course of business with respect to through shipments."

*Morgan* v. *Missouri, K. & T. Ry. Co.,* 12 I. C. C. Rep. 525, was decided in 1907. Owing to local competition

the company made a special low rate on shipments of
livestock from Crowder City, Indian Territory, to
Kansas City, Missouri. At the same time it had joint
rates with other roads from points west of Crowder
City to Kansas City which were greater than the sum
of local rates to Crowder City plus the special low
rate from thence to Kansas City. The commission
sustained the right to charge the joint rate on ship-
ments originating west of Crowder City without re-
duction on account of the special low rate named.
Answering the contention that this would allow ship-
pers from the west to take their cattle out of the cars
at Crowder City, immediately run them back into the
same cars and forward them to their destination at
Kansas City on the special rate, the commission said:

"There seems to be no doubt as to the right of the
shipper to consign a shipment to a given point, pay
charges upon it, assume custody and take possession
of the property and later reship it to another point
under rates lawfully applicable to such reshipment. A
carrier or carrier's agent may not, however, act as
forwarding or reconsigning agent for a shipper for
the purpose of evading or defeating the terms or pur-
poses of the law or in such manner as to defeat or
evade the intent of the law. To do that would be to
resort to one of the devices prohibited in the act."

The doctrine to be drawn from all these decisions
is that a bill of lading is not conclusive of the character
of the shipment; yet the instruction requested and
specified in the third assignment of error would re-
quire the trial judge to say as a matter of law, based
alone upon the bill of lading in question, that the trans-
action was one of interstate commerce so as to oust
the state court of jurisdiction. If such a document is
inconclusive in one case it is inconclusive in others.
The clear reason of the cases cited is to the effect that

the bill of lading may be considered as a circumstance with other incidents of the transaction throwing light on the question of fact whether it be interstate or intrastate commerce. Notwithstanding the declaration of plaintiff's general counsel and its freight and passenger agent disclaiming all authority over or connection with the shipment beyond its own lines and the testimony of Service to the effect that his company, the original plaintiff, took actual charge and custody of all the lumber at Baker, we are asked to disregard all this and direct the court below to say as a matter of law that the transaction was interstate commerce. At the least these items of testimony to which allusion has just been made were sufficient to carry this disputed question of fact to the jury. That the issue of whether the transaction is interstate commerce or not is one of fact to be determined by the jury under proper instructions is taught also by *State* v. *Taber Lumber Co.,* 101 Minn. 186 (112 N. W. 214, 13 L. R. A. (N. S.) 800) ; *Tredway* v. *Riley,* 32 Neb. 495 (49 N. W. 268, 29 Am. St. Rep. 447, note) ; *Commonwealth* v. *People's Express Co.,* 201 Mass. 564 (88 N. E. 420, 131 Am. St. Rep. 416). In our judgment there is at least some testimony to be considered on both sides of the question about interstate commerce; and however great the preponderance in its favor as estimated by the defendant, we cannot say that its showing is so conclusive as rightly to call from the trial court a peremptory direction to the jury to find against the plaintiff on that point.

2. Moreover, all the instructions referred to in assignments three, four and five are subject to the criticism that they sought to advise the jury of the effect of certain acts which, because of the nature of the contro-

versy, were prominent when there was other evidence in the case which properly could be considered in the same relation. The court cannot select any particular piece of testimony and charge the jury wholly upon that when there are other circumstances proper for its consideration: *Stanley* v. *Smith,* 15 Or. 505 (16 Pac. 174) ; *Patterson* v. *Hayden,* 17 Or. 238 (21 Pac. 129, 11 Am. St. Rep. 822, 3 L. R. A. 529) ; *Crossen* v. *Oliver,* 41 Or. 505 (69 Pac. 308) ; *State* v. *Deal,* 43 Or. 17 (70 Pac. 534) ; *Kellogg* v. *Ford,* 70 Or. 213 (139 Pac. 751) ; *Saratoga Inv. Co.* v. *Kern,* 76 Or. 243 (148 Pac. 1125). The principle is thus aptly stated in the syllabus to *Church* v. *Melville,* 17 Or. 413 (21 Pac. 387) :

"Unless evidence is by law conclusive upon the parties, it would be error for the trial court to select a single fact or part of the evidence where there was a conflict, and instruct the jury that they must find their verdict on that fact alone, and in a particular way. Such an instruction would be an invasion of the rights of the jury."

In cases like the present it is permissible for the court to state to the jury a hypothetical case covering the entire contention of each party and to declare to the jury that if they find such to be the fact the law will be as directed by the court. If the testimony is indisputably all one way the court can direct a verdict according to the admitted facts; but where there is any material dispute about the facts or where reasonable men legitimately may draw different conclusions from a given state of facts, the decision of the ultimate question in dispute in a jury case must be left to the jurors. There was no error in refusing the instructions alluded to in the third, fourth and fifth assignments of error because they each invaded the province of the jury.

3. Besides all this, it is not directly alleged in the answer that the acts therein described were done under a common control, management or arrangement for a continuous shipment from one state or territory of the United States to any other state or territory. It is said that the lumber "was consigned and destined for points outside of the State of Oregon," as shown by the bills of lading made out by the plaintiff and signed by the defendant's representative; that the lumber was delivered to a connecting line of railroad at Baker for the purpose of being transported by that carrier by whom it was carried to points outside of the state and delivered; and that the connecting carrier paid to the defendant its charges for the haul from Deer Creek Spur to Baker. As the statute then stood all these things might have been done without there being any common control, management or arrangement for a continuous carriage. The pleading is silent on the point of the transaction being the result of common control. The statements in the answer narrate matters which would no doubt be receivable in evidence as circumstances tending to prove common control, but this ultimate fact is not stated. That the things alleged in the answer in that behalf do not necessarily constitute interstate commerce is shown by *Heiserman* v. *Burlington, C. R. & N. Ry. Co.,* 63 Iowa, 732 (18 N. W. 903); *United States* v. *Geddes,* 131 Fed. 452 (65 C. C. A. 320); *Interstate Commerce Comm.* v. *Bellaire etc. R. Co.,* 77 Fed. 942; *Coe* v. *Errol,* 116 U. S. 517 (29 L. Ed. 715, 6 Sup. Ct. Rep. 475); *Diamond Match Co.* v. *Ontonagon,* 188 U. S. 82 (47 L. Ed. 349, 23 Sup. Ct. Rep. 266).

4. It was error to allow interest on the sort of claim described in the complaint. The question was con-

sidered and decided in *Sargent* v. *American Bank &
Trust Co.*, 80 Or. 16, 38 (154 Pac. 759, 156 Pac. 431).

5, 6. It remains to consider whether substitution was
effected in the Circuit Court so as to allow the stock-
holders of the original corporate plaintiff to prosecute
this action.

So far as the allegations thereof are concerned the
cause was tried the third time in the Circuit Court on
the same complaint used in the first trial. The only
indication of actual substitution there is that in some
places afterwards the names of Robert Service, Mrs.
Robert Service and Peter Service were put into the
title of the cause. There is an utter absence of aver-
ment connecting any of these individuals with the origi-
nal plaintiff corporation or with the matters alleged
in the complaint. It becomes necessary to inquire:
1. As to the effect and extent of the order of this court
allowing a substitution of parties plaintiff; and
2. Whether substitution was actually accomplished in
the Circuit Court. This is an action at law, the final
determination of which is embodied in a judgment.
This court has no original jurisdiction in such cases.
The cause is not tried here *de novo* as in suits in equity.
In actions at law of this sort the Supreme Court exists
only to review the decisions of the Circuit Court on
questions of law appearing in the transcript: Section
556, L. O. L. This, of course, is subject to the terms of
Article VII, Section 3, of our Constitution authorizing
this court on appeal to direct judgment in certain cases
in like manner and with like effect as decrees are en-
tered in equity cases; but hitherto the court has not
exercised that prerogative herein.

Remembering that the cause was originally prose-
cuted to final judgment in the Circuit Court and the
appeal perfected eight days before the expiration of

five years from the dissolution of the former plaintiff corporation, it is apparent that prior to the first appeal the question of substitution of parties had not arisen in the Circuit Court, nor could it have arisen because the plaintiff corporation was yet in existence as an active participant in the litigation. Up to the time of the first appeal, therefore, the Circuit Court had not committed any error about change of parties and there was nothing in that respect either to affirm or to reverse. Meanwhile, the plaintiff corporation had lapsed. Section 38, L. O. L., reads thus:

"No action shall abate by the death, marriage, or other disability of a party, or by the transfer of any interest therein, if the cause of action survive or continue. In case of the death, marriage, or other disability of a party, the court may, at any time within one year thereafter, on motion, allow the action to be continued by or against his personal representatives or successors in interest."

This statutory rule is applicable in the following manner to the transactions already had in this court as to a change of parties: An appeal is a proceeding distinct and separate from the original judgment: *Shirley* v. *Burch*, 16 Or. 1 (18 Pac. 344). It can be determined only in the appellate court. The cause of action on appeal is the right to have the determination of the Circuit Court reversed or modified: *Jameson* v. *Bartlett*, 63 Neb. 638 (88 N. W. 860). The proceeding to enforce this cause of action, as distinguished from the one in the complaint, was ripe for the consideration and determination of this court when the appeal was perfected on April 29, 1912, eight days before the lapse of the original corporate plaintiff. Having thus acquired jurisdiction over the parties and the subject matter of the new action, conventionally denominated

an appeal, which was instituted to overturn the judgment of the Circuit Court, this court, in a case where substitution is permissible, has power to retain the proceeding and preserve it by the requisite change of parties for the purposes of the appeal and the adjudication thereof, but no further. It is much like *Pendleton* v. *Russell,* 144 U. S. 640 (36 L. Ed. 574, 12 Sup. Ct. Rep. 743), where an insurance corporation was dissolved pending its appeal to the United States Supreme Court. Its receiver in the state court which dissolved it obtained permission there to employ counsel in the United States Supreme Court to argue the case. He did so and the original decision was reversed. No substitution was made anywhere. In a new trial a judgment was again rendered against the corporation and it was held on final appeal to the United States Supreme Court that the receiver was right in rejecting the last judgment as a claim against property in his hands because being against a defunct corporation it was a nullity. To allow substitution here for the purposes of litigation over which this court has obtained jurisdiction by perfection of appeal is a necessary incident to the exercise of the only authority vested in this tribunal; but it cannot assume or exercise control in matters referable alone to the original jurisdiction of the Circuit Court. The only function of substitution in this court was to enable us to decide the question before us on appeal and the purpose of its exercise having been accomplished its effect is ended. Whatever may be said as to the regularity of the substitution in this court for the first time, the order allowing it is the law of the case. The question is what was the extent and effect of the order. The reversal left the litigation where it was at the beginning of the first trial in the Circuit Court and if any-

one was entitled to prolong it as the successor in interest of the original plaintiff it was his duty to apply to that court for leave to be substituted for his predecessor in title.   It is taught in *Reay* v. *Heazelton,* 128 Cal. 335 (60 Pac. 977), that change of parties in the Supreme Court should be followed by substitution in the court below on proper averments.   Again, in *Fay* v. *Steubenrauch,* 138 Cal. 656 (72 Pac. 156), it is laid down that substitution should be made first in the *nisi prius* court; but when made first in the Supreme Court it should be renewed in the trial court.   It is said in *Planters' Bank* v. *Bass,* 2 La. Ann. 430, that if substitution in the Supreme Court involves only a question of law it will be made for the purpose of exercising appellate jurisdiction; but if a matter of fact is drawn in question, the cause will be remanded to the lower court to work out the substitution.   The doctrine to be derived from *Pendleton* v. *Russell,* 144 U. S. 640 (36 L. Ed. 574, 12 Sup. Ct. Rep. 743), is that in the absence of substitution before the court having original jurisdiction the resulting judgment is a nullity.   In *Prior* v. *Kiso,* 96 Mo. 303 (9 S. W. 898), it is taught that on the death of a sole defendant in error it is competent to make his representative a party on return of the cause to the lower court.   In *MacRae* v. *Kansas City Piano Co.,* 69 Kan. 457 (77 Pac. 94), the statute made the directors in office at the time of the dissolution of a corporation trustees for the purpose of winding up the business; but even then it was held that a judgment in favor of the corporation afterwards dissolved could not be enforced without the substitution of these trustees, and the Supreme Court remanded the cause to the Circuit Court for further proceedings.

It is clear that the order of this court allowing substitution was applicable only to the proceedings before

it and could have no further effect. To hold otherwise would be to say that a stranger to the cause may for the first time appear in the Supreme Court, mend his hold by withdrawing the demurrer of the former plaintiff to the plea of the defendant made below that the corporate plaintiff has been dissolved and confess and avoid the same by a reply that the newcomer is its successor. This would amount to a pure departure from the original cause of action as stated in the complaint and the allowance of it would be an infringement upon the original jurisdiction of the Circuit Court. Again, whether the interveners are really stockholders and all of such share owners interested in the original plaintiff and whether all its debts were paid so that the shareholders became tenants in common of the residuum of its assets and might have instituted appropriate litigation to recover the same are facts necessary to be alleged in issuable form to constitute a good complaint in their behalf if they would bring themselves within the doctrine of such cases as *Baldwin* v. *Johnson,* 95 Tex. 85 (65 S. W. 171), *Stearns Coal & Lumber Co.* v. *Van Winkle,* 221 Fed. 590 (137 C. C. A. 314), *Stark Elec. R. Co.* v. *McGinty Contracting Co.,* 238 Fed. 657 (151 C. C. A. 507), and *Gasque* v. *Ball,* 65 Fla. 383. The precedents just noted are not authority for change of parties in an appellate court exercising jurisdiction over a new and distinct proceeding. Neither are they instances where stockholders were substituted for their corporation at *nisi prius.* In none of them did the corporation commence the original litigation. Those decisions merely enunciate the principle that when the corporation is in very truth wound up and all claims against it are satisfied, a situation is presented where the stockholders have be-

come the legal as well as the equitable owners of what remains of the property of the concern and may recover it by suitable procedure. On the necessary allegations authorizing such a recovery the defendant is entitled to its day in court and issue being tendered and joined upon them in this action at law, it has the right to a jury trial which cannot be forestalled or violated by the order of substitution which this court made only for the purposes of the appeal of which alone it had jurisdiction: Or. Const., Article I, Section 17. The *ipse dixit* of an *ex parte* affidavit presented only to the appellate court in connection with litigation there cannot supersede the right of trial by jury in the Circuit Court.

That Section 38, L. O. L., relates to corporations is at least the law of this case, but even then this court will apply its provisions only to the extent of its own jurisdiction for the preservation of the cause of action before it which is none other than the right to review the decision of the Circuit Court; and will not invade the original jurisdiction of that court on a question which has never been presented to it. Even in *Long v. Thompson,* 34 Or. 359 (56 Pac. 978), this court did not pretend to change parties except for the purposes of the appeal nor to impose its order upon the Circuit Court so as to bar that tribunal from deciding by jury trial the facts upon which substitution must be granted if allowed. If substitution is made regularly in the Circuit Court where original jurisdiction exists it is binding upon this court; but the reverse is not true. The reason is that under our system the Supreme Court is one of special and limited authority. This power to admit new parties to an action is confined to and is exercised only for the purpose of the proceeding

before it of which it has gained jurisdiction by the perfection of an appeal. We have no right to reverse, affirm or modify the decision of the Circuit Court on matters not presented by its record.

As stated, no change whatever was made in the averments of the complaint upon which the first trial was had. It is taught in *White* v. *Johnson,* 27 Or. 282, 292 (40 Pac. 511, 50 Am. St. Rep. 726), that:

"The procedure for bringing in new parties after the court has made the order to that effect appears to be to amend the complaint by inserting therein such allegations as are necessary to make the persons omitted parties to the action, and to insert their names in the summons; and if they do not enter an appearance, to serve them with the amended summons and complaint, giving them the usual time allowed by statute to original parties in which to answer: Fitnam's Trial Procedure, § 351; *Penfield* v. *Wheeler,* 27 Minn. 358 (7 N. W. 364)."

7-9. It is true the White-Johnson case was decided with reference to bringing in a defendant; but the analogy supports the doctrine that if a new plaintiff intervenes he must put upon the record proper averments showing his right to sue so that the defendant if it chooses may challenge the same and have a jury to inquire concerning the truth of the issue. The complaint upon which the action was tried the third time being identical in allegations with the one used in the first trial, did not state facts sufficient to constitute a cause of action in favor of the individuals substituted in this court for the purposes of the appeal. The defendant filed a general demurrer to this complaint and the same was overruled. The matter was again raised by a motion on the part of the defendant to direct a verdict in its favor after all the testimony was produced. This motion was also

denied.    If these are not sufficient to raise the question recourse may be had to Section 72, L. O. L., where it is stated:

"If no objection be taken, either by demurrer or answer, the defendant shall be deemed to have waived the same, excepting only the objection to the jurisdiction of the court, and the objection that the complaint does not state facts sufficient to constitute a cause of action."

It has been held many times that these excepted grounds of demurrer may be urged the first time in the Supreme Court and that failure to count upon them in the assignments of error does not conclude the appealing party.    Moreover, it is an error apparent upon the face of the record and involves a decision upon a point of law made wholly upon matters in writing and on file in the court.    Hence, the question is before us despite the criticism made of the motion for a nonsuit which did not specify the grounds upon which it was urged.    Neither is the objection properly classified as one going to the legal capacity of the plaintiffs to sue.    It is true that if it is manifest upon the face of the complaint that the plaintiff has not legal capacity to sue it is ground of demurrer under Section 68, L. O. L., and one which is waived if it so appear and the defendant answers without raising that objection.    That rule applies to cases where it appears by the first pleading that the moving party himself would have a cause of action except for some disability apparent in his initiatory statement, such as minority, insanity or the like.    To be a good complaint, immune from the effects of a general demurrer, the plaintiff must show in himself legal connection with the matter involved in litigation and a right in himself to recover the amount demanded.

Failing in this, his pleading does not state a cause of action and the objection may be raised for the first time in the Supreme Court.

In brief, on this branch of the case, the effect of the substitution of parties in this court ended with the reversal of the judgment of the Circuit Court. If anyone claiming under the original plaintiff would have continued the litigation it was his duty to apply to the Circuit Court to be substituted. Having obtained the necessary permission there, it could be enjoyed and made available only by appropriate averments amending the complaint, in default of which no judgment could be rendered against the defendant in favor of the plaintiffs any more than A could recover upon a promissory note given to B by C without alleging indorsement to himself. It is true that, as appears by the abstract, the Circuit Court on December 9, 1916, entered an *ex parte* order ''that Robert Service, Mrs. Robert Service and Peter Service be, and they hereby are substituted in this court as parties plaintiff in said cause.'' The language of Section 38, L. O. L., is that ''the court may * * allow the action to be continued by or against his personal representatives or successors in interest.'' The order of the Circuit Court, therefore, amounted to no more than permission to the applicants to proceed in their own right, which might have been denied; but it did not, nor could it, dispense with the necessity of their stating a cause of action in themselves. In other words, although allowed to make substitution they did not accept the permission in the only way it could be made available. We have thus a situation where substitution has not been effected in the Circuit Court which alone has original jurisdiction to determine the case on its merits. To all intents and purposes the prosecution

of the action was continued as if the proceedings were conducted in the name of the corporation. The allegations of the complaint cannot be controlled nor enlarged by the mere names used in the title. The result is in legal effect as though a judgment had been rendered in favor of a defunct corporation.

"Where the charter of a corporation expires during the pendency of a suit the suit must abate whether the company be plaintiff or defendant": *Rider* v. *Nelson etc. Union Factory,* 7 Leigh (Va.), 154 (30 Am. Dec. 495).

In *Greenbrier County* v. *Livesay,* 6 W. Va. 44, Livesay and others sued to compel the board of supervisors of Greenbrier County to admit them to seats in that body. Pending an appeal by the supervisors the board was abolished by constitutional provision and the Supreme Court abated the suit. In *La Pointe* v. *O'Malley,* 47 Wis. 332 (2 N. W. 632), the plaintiff town was abolished by the county authorities before it appealed. The Supreme Court held that the appeal by it must be dismissed as its action had abated. In *Venable Bros* v. *Southern Granite Co.,* 135 Ga. 508 (69 S. E. 822, 32 L. R. A. (N. S.) 446), after the expiration of the charter the litigation was carried on by two men who owned all the stock. On hearing in the lower court of the report of the referee counsel for the corporation suggested its lapse and the court abated the action. In *May* v. *State Bank,* 2 Rob. (Va.) 56 (40 Am. Dec. 726), the charter of the defendant expired pending an action prosecuted by it, but judgment was rendered in its favor after appeal although the decision was the other way in the trial court before the charter lapsed. An execution was issued on the judgment rendered in that court in obedience to the reversal, but after the expiration of

the charter. The writ was quashed on showing the dissolution of the corporation. *Rankin* v. *Sherwood,* 33 Me. 509, decides that an action brought against a corporation whose charter has been repealed results in a void judgment. *Merrill* v. *Suffolk Bank,* 31 Me. 57 (50 Am. Dec. 649), teaches that no legal judgment can be rendered against a defunct corporation, and that stockholders in such a concern, whose property has been levied upon to satisfy a judgment rendered against it after dissolution, have sufficient privity to sue out a writ of error to annul it. It is decided in *Thornton* v. *Marginal Freight Ry. Co.,* 123 Mass. 32, that a judgment against a corporation after expiration of the statutory three year period in which it may wind up its business on dissolution is void. The owner of such a judgment has no standing in equity to reach its assets in the absence of the appointment of a receiver. So also in *Eagle Chair Co.* v. *Kelsey,* 23 Kan. 632, it is said that the court will not render a judgment on the verdict for a defunct corporation nor for its assignee without amendment of the pleadings to show his right to the judgment. In *Kelly* v. *Rochelle* (Tex. Civ.), 93 S. W. 164, the court distinguishes between actions and suits to which a dissolved corporation is a party and demonstrates that the dissolution abates an action beyond revival while the suit is in a state of suspension subject to review by bill of revivor. In *Life Assn.* v. *Goode,* 71 Tex. 90 (8 S. W. 639), after holding that no action can be prosecuted by or against a corporation after its dissolution and that judgment cannot be rendered thereon, the court says:

"At law an action abated by the death of a sole defendant ceases for all purposes, is entirely dead and

cannot be revived." See, also, *Dundee Mortgage &
Trust Inv. Co.* v. *Hughes,* 77 Fed. 855, 856.

10. Authorities might be multiplied showing that un-
less the statute allowing substitution is complied with
the action at law abates irrevocably. In this instance,
as we have seen, there were no attempts by appropriate
averment to charge the defendant on behalf of the in-
dividuals who have attempted to continue the litiga-
tion. Under the precedents cited the result was a
void judgment. The rule has been laid down in this
state that an appeal may be taken by an aggrieved
party from such a judgment: *Smith* v. *Ellendale Mill
Co.,* 4 Or. 70; *Trullenger* v. *Todd,* 5 Or. 36; *Askren* v.
*Squire,* 29 Or. 228 (45 Pac. 779); *Oregon R. & N. Co.*
v. *Eastlack,* 54 Or. 196 (102 Pac. 1011, 20 Ann. Cas.
692); *Sturgis* v. *Sturgis,* 51 Or. 10 (93 Pac. 696, 131
Am. St. Rep. 724, 15 L. R. A. (N. S.) 1034; *Holton* v.
*Holton,* 64 Or. 290 (129 Pac. 532, 48 L. R. A. (N. S.)
779). The disposition to be made of the latest decision
of the Circuit Court is therefore properly before us.

11. In the judgment of the writer, the power of this
court in the matter of substitution was *functus officio*
when the case was reversed June 20, 1916, and could
have no further effect. It was exercised only as a
means of determining the case then before us, the
decision of which set the matter at large so far as
the Circuit Court was concerned. This court had no
right and did not attempt on the record before it at
that time, to foreclose the defendant from resisting
an attempt by new parties to intrude upon the litiga-
tion in the Circuit Court. Neither had we the power
nor did we pretend to suspend or prolong the one year
period mentioned in Section 38, L. O. L., in the in-
terest of the stockholders who brought about the lapse

of their corporation by their own act and made no move to avail themselves of the benefit of the statute until eight years thereafter. Still less had we authority to control in advance, the exercise of its original jurisdiction by the Circuit Court acting under that section. None of the opinions heretofore rendered sanctions the idea that we could do so.

Passing all this, however, the utmost effect to be given to the former remand for a new trial, the result reached in the opinion of Mr. Justice BEAN rendered June 20, 1916, was thereby to allow the stockholders to make a case in the Circuit Court if they could. As we have shown, this involved their application there for leave to be substituted, coupled with an amended complaint stating a cause of action on their behalf. Granting that the reversal set forward the demise of the original corporate plaintiff to that date and made Section 38, L. O. L., again applicable, it also again put into operation the one year limit of that section within which the would-be plaintiffs should have had themselves substituted below. Though warned of this element of the litigation by the law and the constant attitude of the defendant, yet to this day so far as the record shows they have taken no measure to avail themselves of the opportunity afforded them to present to the trial court their own case in lieu of that of the corporation under which they claim. Persistently the contest has been waged on the old complaint which states nothing to the direct advantage of the individual stockholders. By failing to put in an amended pleading showing in themselves a right to recover, they have utterly neglected to prepare for the new trial awarded by the opinion of Mr. Justice BEAN. Meanwhile, under the construction most favorable for them, the year since

then in which they might have amended the complaint has passed and they are yet without a statement of their cause of action as distinguished from that of the original corporation. Time has thus foreclosed their opportunity to substitute the one for the other in this action. It would be useless to remand this case for a new trial, for the obstacle preventing substitution is insuperable. We can only give the defendant a judgment here reversing that of the Circuit Court without the condition awarding a new trial.

In dismissing this branch of the case it will be noted that consideration has been given only to the right to continue the prosecution of this particular action and not to the question of whether a cause of action or suit exists in favor of the stockholders or is barred by lapse of time. As to those possible features, we make no intimation.

On the appeal of the plaintiffs they rely upon certain questions about admission of testimony affecting the basis upon which reasonableness of rates is to be determined and instructions on the same questions. For the purposes of this opinion it is sufficient to say that those matters are sufficiently considered in the original opinion: 67 Or. 63 (135 Pac. 539). The conclusion of the whole matter is that the judgment of the Circuit Court is reversed without the usual privilege of a remand for further proceedings.

REVERSED.    REHEARING DENIED.

MOORE and McCAMANT, JJ., not sitting.